ERICKSON v DART OIL & GAS CORPORATION

Docket No. 125360. Submitted November 6, 1990, at Grand Rapids. Decided June 17, 1991, at 9:00 A.M. Leave to appeal sought.

John E. Erickson brought an action in the Osceola Circuit Court against Dart Oil & Gas Corporation and Petrostar Energy, alleging that the defendants wrongfully refused to execute a release of an oil and gas lease. The trial court, George Van-Kula, J., sitting without a jury, entered judgment in favor of the defendants, finding that the lease had not been forfeited or otherwise terminated, but, rather, had been extended through the operation of a force majeure clause or because a sufficient equitable basis existed for its extension. The plaintiff appealed.

The Court of Appeals *held:*

1. The force majeure clause cannot be utilized to extend the primary term of the lease beyond its expiration date. It was Petrostar's actions, not those of the Department of Natural Resources, that delayed the issuance of a drilling permit beyond the expiration date of the lease. The termination was not attributable to circumstances beyond Petrostar's control.

2. The DNR was not required to issue a drilling permit within ten days of Petrostar's application, because Petrostar had not complied with the statutory requirements for issuance.

3. There was no forfeiture of the lease. The lease expired by its own terms at the conclusion of its primary term because the defendants failed to meet an express condition that they begin operations within the primary term. The defendants are not entitled to equitable extension of the lease.

4. The plaintiff is not entitled to damages, costs, and attorney fees under MCL 554.281, 554.282; MSA 26.1161, 26.1162 because such relief applies only to leases which have been forfeited, not those which expire by their own terms.

Reversed.

*William E. Tapovatz,* for the plaintiff.

*Kevin V. B. Schumacher* and *James Anthony Siver,* for Dart Oil & Gas Corporation.

*Zirnhelt, Koop, Seaman & Bruce, P.C.* (by *Charles H. Koop*), for Petrostar Energy.

Before: NEFF, P.J., and MAHER and HOOD, JJ.

NEFF, P.J. This case involves an oil and gas lease. Plaintiff owns land subject to an oil and gas lease. The lease was owned by defendant Dart Oil & Gas Corporation, which assigned it to defendant Petrostar Energy for development. Plaintiff claimed that the lease was "terminated, forfeited and rendered void" by its own terms on March 2, 1986, and demanded that it be released pursuant to MCL 554.281; MSA 26.1161. Defendants refused to execute a release of the lease, and this litigation resulted.

Plaintiff's motion for summary disposition was granted only as it related to whether the lease had been extended by "operations" begun before March 2, 1986. The motion was denied with regard to the issues of force majeure and equitable extension. The trial judge heard the case without a jury and entered judgment in favor of defendants, finding that the lease had not been forfeited or otherwise terminated, but rather that it had been extended.

Plaintiff appeals as of right. Defendants do not cross appeal the partial summary disposition in plaintiff's favor on the "operations" issue. We reverse.

I

A review of the facts and chronology is necessary to understand the legal issues.

A

The lease in question was executed on March 2,

1981, with plaintiff's father as lessor and Dart as lessee. Plaintiff's father died in November 1981, and plaintiff acquired a one-tenth interest in the land covered by the lease. The lease has a five-year primary term which is subject to extension under various circumstances. Absent the occurrence of any of the circumstances which would extend the lease, its scheduled expiration date was March 2, 1986.

Between 1981 and 1984, Dart was either unable or unwilling to explore and develop the hydrocarbon deposits under the property. In early 1984, Dart and Petrostar executed a "farmout agreement" covering the property. This agreement amounts to an assignment of the rights to explore and develop the oil and gas potential of the property to a party willing to begin development.

After execution of the farmout agreement, Petrostar evaluated the potential for successful development and then sought permission from the Department of Natural Resources to drill a discovery well. The application for a permit to drill the discovery well was filed by Petrostar on June 29, 1985, and on July 25, 1985, twenty-six days later, a permit was issued authorizing Petrostar to drill a well designated Boyce 1-19.

B

There are apparently different, specific phases of exploration and development of hydrocarbon deposits such as oil and gas. In the case of the Boyce 1-19 well, the drilling phase was completed on November 23, 1985. Gas was found to be present as a result of the drilling of Boyce 1-19.

The site of the Boyce 1-19 well was selected because it provided the best chance of encounter-

ing oil and gas, on the basis of the evaluations of Petrostar's employees. The Boyce 1-19 well was not located on land subject to plaintiff's lease or on any land pooled with land subject to plaintiff's lease. As the end of the primary term of plaintiff's lease approached, these facts became significant.

C

The drilling phase of an oil and gas development project does not necessarily determine the commercial potential of the well or field, even if hydrocarbons are discovered. After the end of drilling on November 23, 1985, Petrostar began the completion-of-the-well phase of Boyce 1-19 to determine whether the well was capable of producing gas at commercial rates. This phase began on December 2, 1985, and consisted of a number of tests which continued through December and into January. It was not until January 29, 1986, that Petrostar conclusively determined that the Boyce 1-19 well was capable of producing gas at commercial rates. However, it is clear from the trial testimony of Petrostar employees that there was a firm belief in the commercial potential of the Boyce 1-19 well before the January 29 date.

Because of pending lease expirations, including plaintiff's, Petrostar began in December 1985 to take steps to prevent the expirations, even before finishing the testing activity of the completion phase of the project. Events then began the course which led to the controversy now before us.

D

Plans were made to drill a second well. A pooling declaration and agreement was prepared, but not filed. A spacing petition was submitted to the

Supervisor of Wells on December 16, 1985, seeking the establishment of three 640-acre drilling units and one 320-acre drilling unit in the area of Boyce 1-19. A hearing was held on the spacing petition on February 18, 1986. Two problems arose which caused delays which created serious problems regarding the expiration of plaintiff's lease.

First, at the hearing on the spacing petition, an attorney representing an energy company requested an adjournment to study Petrostar's geologic evidence.[1] Apparently, Petrostar's spacing petition represented a significant change in the spacing of wells within the applicable formation, Prairie du Chien. The hearing was adjourned to March 18, 1986.

Because the adjourned date was later than the March 2, 1986, expiration date of plaintiff's lease, Petrostar requested an interim order for an exception to spacing requirements.[2] At the hearing, the request for an interim order was granted with the promise that a written order would follow. The following day, February 19, 1986, Petrostar prepared an application for a drilling permit for a second well, designated Cole 2-19, even though the written order was not yet in hand. This application was hand-carried to Lansing to expedite the permit process.

---

[1] The same attorney was later retained to represent plaintiff. There is no claim that the attorney was retained by plaintiff before the hearing on the spacing petition or that the request for an adjournment was in any way connected to his later representation of plaintiff.

[2] Administrative rules prohibit the granting of a drilling permit to drill a development well within a two-mile radius of a discovery well located in the center of a quarter-quarter section of land, as was Boyce 1-19. 1979 AC, R 299.1202(2) provides: "If said discovery well is located in the center of a quarter-quarter section of land, no permit shall be granted for the drilling of a development well within a 2-mile radius of such well, or on the same apparent contiguous structure, until a public hearing has been held to determine the need or desirability of adopting a special spacing order as provided in R 299.1203."

As part of the permit process, a DNR employee inspected the proposed site of the Cole 2-19 well on February 21, 1986. A Petrostar employee accompanied him, again in the hope of expediting the process. At this point, a second problem cropped up which spelled delay and difficulty regarding the impending expiration of plaintiff's lease.

While inspecting the proposed site of the Cole 2-19 well, the DNR inspector determined that the access route to the site might involve wetlands for which a separate wetlands permit would be required. Between February 22 and February 25, 1986, an application for a wetlands permit was prepared by Petrostar. It was hand-carried to Lansing on February 26, 1986. At the same time, Petrostar was identifying alternate sites for the Cole 2-19 well as a potential means to avoid the need for a wetlands permit.

On February 25, 1986, Petrostar filed the pooling declaration and agreement which had been prepared in December 1985. It was not filed earlier to prevent competitors of Petrostar from gaining advance notice of Petrostar's plans for development of the project.

It soon became obvious that the issuance of a wetlands permit was not possible before March 2, 1986, or any time close to that date. Petrostar had to formulate an alternative plan which would allow it to begin operations to prevent expiration of the lease.

E

Petrostar's proposed solution was to withdraw the application for a permit to drill at the Cole 2-19 site and to apply for a permit to drill a development well at the site of the Boyce 1-19 discovery well. The new well was designated Boyce 2-19 and

the application for the drilling permit was hand-carried to Lansing on February 28, 1986, a Friday. The Boyce 2-19 well was proposed to be directionally drilled, a more costly method, but more expeditious, under the circumstances. The lease which covered the bottom-hole area of the proposed Boyce 2-19 well had been pooled with plaintiff's lease pursuant to the pooling declaration and agreement filed on February 25, 1986.

Petrostar's plan was for the permit to drill the Boyce 2-19 well to be issued on February 28, 1986, the same day it was hand-carried to Lansing. Petrostar was in a position to begin operations on the Boyce 2-19 well immediately after issuance of the drilling permit because it had a drilling rig in place in anticipation of the need for an immediate commencement of drilling operations. In fact, Petrostar rented the rig early in February 1986 at a cost of about $1,500 a day, because there was a shortage of drilling equipment and Petrostar wanted to be able to begin drilling as soon as the permit was issued, in light of the impending lease termination. The permit was not issued until March 5, 1986, and Petrostar began drilling soon afterwards.

However, plaintiff considered the lease to have expired by its own terms on March 2, 1986. Defendants considered the lease to have been extended for a number of reasons, two of which concern us in this appeal: the applicability of the so-called "force majeure" clause of the lease (actually paragraph eleven of the lease) and because of equitable considerations.

F

The trial court agreed with defendants and held that a force majeure had operated to extend the

primary term of the lease. The court held that (1) the causes of the delays in issuing a drilling permit for the second well were attributable solely to the DNR and were not the fault of defendants, (2) defendants neither knew nor could have known or anticipated the causes of the delays by the DNR, and (3) defendants acted at all times in good faith and as reasonable and prudent operators. The trial court also held that, without regard to the force majeure clause of the lease (paragraph eleven), a sufficient equitable basis existed to extend the lease.

This appeal by plaintiff followed.

II

The first claim on appeal is that the trial court erred in holding that paragraph eleven of the lease operated to extend the term of the lease beyond March 2, 1986. This is the so-called "force majeure" clause.

A

We note that the term "force majeure" is nowhere used in paragraph eleven or, in fact, anywhere in the lease. Moreover, that term is virtually unknown in Michigan common law. Only one case has been found in which the term appears, and there it is mentioned merely in a footnote. *Union Carbide Corp v Public Service Comm,* 431 Mich 135, 143, n 4; 428 NW2d 322 (1988).

Paragraph eleven of the plaintiff's lease reads as follows:

If, while this lease is in force, at, or after the expiration of the primary term hereof, it is not being continued in force by reason of the shut-in well provisions of paragraph 3 hereof, and lessee is

not conducting operations on said land by reason of (1) any law, order, rule or regulation, (whether or not subsequently determined to be invalid) or (2) any other cause, whether similar or dissimilar, (except financial) beyond the reasonable control of the lessee, the primary term hereof shall be extended until the first anniversary date hereof occurring ninety (90) or more days following the removal of such delaying cause, and this lease may be extended thereafter by operations as if such delay had not occurred.

B

There is no dispute that operations began at Boyce 2-19 after the March 2, 1986, expiration of the primary term of plaintiff's lease. The question on appeal is whether paragraph eleven of the lease was properly interpreted to extend the primary term past the expiration date.

Plaintiff argues that the delay was the result of defendants' lack of diligence in seeking a drilling permit and pooling agreement in sufficient time to allow operations to begin before his lease expired. Defendants counter with the argument that administrative delay beyond their control and within the meaning and intent of paragraph eleven was the operative cause.

C

The trial judge analyzed the delay matter by considering, in summary, the activity of defendants from the date of the execution of the lease, March 2, 1981. He found no untoward delay from that date until the farmout agreement between Dart and Petrostar in early 1984. He concluded that Petrostar's actions from that point until its petition for a spacing order on December 16, 1985,

were reasonable and prudent. We do not disagree with his conclusions, because we find nothing in the record to lead us to a contrary opinion.

The trial judge further concluded that because defendants acted as reasonable and prudent operators in the four years and nine months from the execution of the lease until December 16, 1985, the applicability of paragraph eleven is limited to the events which occurred after that date. While we do not necessarily agree with this conclusion, we will not rule on its validity because, even focusing on the last three months of the lease term, as the trial judge did, we cannot conclude that paragraph eleven was correctly construed to extend the lease beyond March 2, 1986.

No Michigan case addresses the doctrine of force majeure. Cases in other jurisdictions, however, provide some general authority on the interpretation of such clauses in the context of oil and gas leases.

A force majeure clause cannot be invoked to excuse performance where the delaying condition was caused by the lessee and could have been prevented by the exercise of prudence, diligence, and care. *Edington v Creek Oil Co,* 213 Mont 112, 120; 690 P2d 970 (1984). A lessee's failure to explore or utilize available options to overcome the delaying condition can constitute a lack of due diligence. *Woods v Ratliff,* 407 So 2d 1375, 1378-1379 (La App, 1981).

Where governmental action is alleged to be the cause of delay, the parties to the lease are presumed to have contracted with knowledge of any preexisting law that could have caused delay. See *Hughes v Cantwell,* 540 SW2d 742, 745 (Tex Civ App, 1976). A lessee cannot excuse nonperformance by showing that it tried but was unable to perform, unless the impossibility arises out of the

nature of the act to be done, rather than the inability of the lessee to do it. *Baldwin v Kubetz,* 148 Cal App 2d 937, 945; 307 P2d 1005 (1957).

The purpose of a force majeure clause is to relieve the lessee from harsh termination of the lease due to circumstances beyond its control that would make performance untenable or impossible. See *Edington, supra,* p 119. A lessee may not invoke a force majeure clause to excuse performance where the force majeure itself was created by the lessee. *Id.,* p 120.

Even if only the events that occurred after Petrostar's application for the Cole 2-19 well are considered, the trial court clearly erred when it held that those events extended the primary term of the lease through the force majeure clause and that the delay in issuing the drilling permit was attributable solely to the DNR. Our review of the record convinces us that the delay was attributable tc Petrostar, and the termination of the lease was not due to circumstances beyond its control.

The progress of the permit process after December 16, 1985, was not affected by any unforeseeable, unreasonable, or even unusual bureaucratic delay. In fact, it appears from the record that DNR personnel made every attempt to accommodate Petrostar's efforts to secure the necessary permit within the requirements of the applicable statutory framework. Petrostar had no absolute right to the issuance of a permit until such time as it complied with the dictates of the statutory scheme. Neither did Petrostar have a right, failing compliance with the statute, to the issuance of a permit within a particular time frame.

As an experienced oil and gas developer, Petrostar was obviously well aware of the legal requirements to obtain the necessary drilling permit. There is nothing in the record which suggests that

any of these requirements was rendered impossible to meet by any action or inaction of the DNR. All that has been shown is that Petrostar was unable to perform under the lease because it did not leave enough time to account for the predictable timing of the permit process. Actions of Petrostar evidenced its knowledge that the permit process often proceeds by fits and starts, and it simply was caught short.

Petrostar initially selected a drilling site (Cole 2-19) with a potential wetlands problem. It then wasted four valuable days (February 22, 1986, to February 25, 1986) preparing an application for a wetlands permit, knowing full well that a wetlands permit could not possibly issue in time, then withdrawing the application on February 27, 1986. Petrostar finally filed its revised application for the Boyce 2-19 well on February 28, 1986, a Friday, hoping for a same-day issuance of the permit.

Nothing here supports a finding of the extraordinary circumstances necessary to hold that the actions or inactions of the DNR constituted a force majeure. We conclude that the provisions of paragraph eleven do not apply on the facts of this case because nothing which occurred was "beyond the reasonable control of the lessee" so as to justify extension of the primary term of the lease beyond March 2, 1986.

Accordingly, because the delaying condition was caused by Petrostar, defendants cannot enforce the force majeure clause of the lease to extend its primary term beyond the date that it expired.

D

We note that the trial judge found a conflict between 1939 PA 61, § 1 *et seq.*, MCL 319.1 *et seq.*; MSA 13.139(1) *et seq.*, and the Wetland Protection

Act, MCL 281.701 *et seq.*; MSA 18.595(51) *et seq.*, and resolved the conflict by finding that 1939 PA 61 controlled and that the DNR was obligated to issue the drilling permit for the Cole 2-19 well within ten days of Petrostar's application or, in any event, not later than March 2, 1986.

We disagree that a conflict existed. The very language of 1939 PA 61, as amended, itself provides that a permit shall not be issued to any owner who has not complied with or is in violation of the act or any of the rules, requirements, or orders issued by the supervisor or the DNR, and states in pertinent part:

A person shall not drill or begin the drilling of any well for oil or gas, . . . until the owner directly or through his authorized representatives shall have first made a written application to drill any such well and filed with the supervisor a bond as provided in section 6, and received and posted in a conspicuous place at the location of the well a permit in accordance with the rules and requirements or orders made and promulgated by the supervisor. A fee of $100.00 shall be charged for a permit to drill a well subject to this act. *Upon receiving and accepting a written application and payment of the fee required, the supervisor shall within 10 days thereafter issue to any owner or his authorized representative, a permit to drill. A permit to drill shall not be issued to any owner or his authorized representative who does not comply with the rules and requirements or orders made and promulgated by the supervisor. A permit shall not be issued to any owner or his authorized representative who has not complied with or is in violation of this act, or any of the rules, requirements or orders issued by the supervisor, or the department of natural resources.* [MCL 319.23; MSA 13.139(23). Emphasis added.]

The trial court's interpretation of the statute

focuses on the first emphasized sentence in the statutory quote while ignoring the next two sentences. That interpretation renders the second and third sentences meaningless. It is a maxim of statutory construction that all provisions of legislative enactments be given meaning. A statute must be read in its entirety, giving due consideration to all its provisions. *Auto-Owners Ins Co v State Farm Mutual Automobile Ins Co,* 187 Mich App 617, 619; 468 NW2d 317 (1991).

In addition, the trial judge's interpretation of the statute would reduce the permit process to mere ministerial status, involving no more discretion than the issuance of a fishing license, a result which is clearly contrary to the intent of the legislation. Because Petrostar had not complied with the requirement that a wetlands permit be issued, the supervisor was not required to issue a permit for the Cole 2-19 well within ten days after application.

### III

The trial judge also found a "sufficient equitable basis on which to extend the lease without regard to the force majeure provisions of paragraph eleven of the lease." However, he did not favor us with an explanation of what factors he found to constitute the "equitable basis," making our review of this issue difficult at best.

The parties each briefly touch on the equitable claim, defendant Petrostar arguing that the lease should be deemed extended on equitable principles, primarily because of its expenditure of approximately five million dollars to develop this project and its considerable effort to secure the necessary drilling permits.

In *Michigan Oil Co v Dep't of Natural Re-*

*sources,* 148 Mich App 745; 384 NW2d 777 (1985), a panel of this Court applied the equitable maxim of "equity abhors a forfeiture" to an oil and gas lease and held that the lessee was entitled to an extension of the lease's ten-year primary term. *Id.,* p 757. However, at the expiration of the primary term of a lease, if there is no production to extend it, the lease ends, not by forfeiture, but by its own terms. *J J Fagan & Co v Burns,* 247 Mich 674, 680; 226 NW 653 (1929).

Although defendants have expended several million dollars on oil-drilling rigs and other equipment, no drilling was being conducted on the lands described in plaintiff's lease at the time of the expiration of the lease. Our review of the record reveals that the lease expired at the conclusion of its primary term because of defendants' failure to meet an express condition, i.e., that they begin operations within the primary term of the lease. There was no forfeiture.

IV

Plaintiff also argues that he is entitled to $100 in damages, all costs, and reasonable attorney fees pursuant to MCL 554.281; MSA 26.1161 and MCL 554.282; MSA 26.1162. We disagree.

Under the plain language of MCL 554.281; MSA 26.1161, the statute applies only to leases which have been forfeited. This statute and MCL 554.282; MSA 26.1162 are unavailable to plaintiff, whose lease expired by its own terms.

Reversed.