## EDEN STONE COMPANY, INC., Plaintiff-Respondent,

v.

## OAKFIELD STONE COMPANY, INC., Defendant-Appellant.†

Court of Appeals

*No. 91-0332. Submitted on briefs September 4, 1991.—Decided December 11, 1991.*

(Also reported in 479 N.W.2d 557.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Raymond E. Krek,* of *Krek & Hue, S.C.* of Jefferson.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Steven P. Sager* and *John R. Emery* of *Sager, Pavlick & Wirtz, S.C.* of Fond du Lac.

Before Nettesheim, P.J., Anderson and Snyder, JJ.

NETTESHEIM, P.J. Oakfield Stone Company, Inc. (Oakfield) appeals from a judgment awarding Eden Stone Company, Inc. (Eden) $347,401. The judgment resulted from a jury determination that Oakfield tortiously converted a quantity of Niagara Dolomite stone located on the property of Daniel and Wendy Schraufnagel. Eden had previously acquired the right to quarry this stone by a lease agreement with the Schraufnagels. We affirm the judgment.

Eden and Oakfield are competitors in the quarrying and sale of various types of building stone. They operate adjacent quarries on separate parcels in Fond du Lac county. Both companies quarry and market a unique and valuable form of Niagara Dolomite stone known as "holey boulders." These boulders are found on a large ledge known as the Niagara Escarpment which runs through the area of Fond du Lac county where both Eden and Oakfield conduct their quarrying operations.

Oakfield originally quarried holey boulders on the Schraufnagel farm during the 1960's and 1970's. Thereafter, Oakfield ceased this operation, and, in 1975, Eden

began quarrying these boulders on the Schraufnagel farm under a lease agreement which gave Eden exclusive quarrying rights.[1] In 1983, Eden and the Schraufnagels renewed this lease arrangement. This lease carried a five-year term with renewal option provisions. This lease was in effect when Oakfield quarried and removed the holey boulders at issue in this case from the Schraufnagel farm.

In May 1987, Eden and Oakfield were competing for the award of a contract on an Illinois construction contract. Oakfield was awarded the contract. In June 1987, Dan Rademann, an Oakfield representative, approached Daniel Schraufnagel and advised that Oakfield had an order for holey boulders which it could not satisfy from its existing quarrying operations. Rademann asked if Oakfield could quarry holey boulders from the Schraufnagel farm. As a result, Schraufnagel and Rademann orally agreed that Oakfield could do so and Oakfield began its operations on the Schraufnagel site in July 1987. Schraufnagel testified that at the time this agreement was struck, Rademann knew of Eden's prior quarrying rights under the 1983 lease between Eden and the Schraufnagels.

Eden learned of Oakfield's quarrying operation on the Schraufnagel site in October 1987. Eden contacted the Fond du Lac County Sheriff's Department which instructed Oakfield to stay off the Schraufnagel property. In November 1987, Eden commenced this action for tortious conversion against Oakfield.[2] We will recite

---

[1] Barbara Schraufnagel, a predecessor in title to the present Schraufnagels, entered into this lease with Eden.

[2] Eden's lawsuit also sounded in injunction, tortious interference with a prospective contract and trespass against Oakfield. The trial court addressed the injunction matter in proceedings prior to trial, and that issue is not before us on appeal. The jury

additional facts as we discuss the issues.

## PRETRIAL MOTIONS TO DISMISS

Oakfield contends that the trial court erred when it refused to address certain pretrial motions on the merits. Instead, the court rejected Oakfield's motions as untimely.[3]

Eden commenced this action in November 1987. On April 18, 1988, the trial court entered a scheduling order setting the case for jury trial on August 8, 1988. The court, however, adjourned this trial date upon stipulation of the parties, rescheduling the jury trial for January 2, 1990. However, due to Oakfield's counsel's illness, the trial date was twice rescheduled—once to May 21, 1990 and again to October 15, 1990. This last trial date was fixed by the court's scheduling order of June 4, 1990.

On September 26, 1990, nineteen days before this latest scheduled trial date, Oakfield filed various motions seeking dismissal of Eden's complaint on numerous legal grounds.[4] Oakfield contended that these motions were dispositive of Eden's entire case against Oakfield. The hearing on the motions was held on September 28, giving Eden only two days advance notice. Because sec.

---

found against Eden on the tortious interference with a prospective contract claim and awarded only one dollar in nominal damages on Eden's trespass claim. Thus, only the conversion cause of action is before us on appeal.

[3]We are tempted to declare this issue moot since the trial court eventually addressed most of the "dispositive" motions during the trial. However, some of Oakfield's pretrial motions were not revisited during the trial. We therefore choose to address this issue on appeal.

[4]The motions were filed by Attorney Raymond Krek who had recently joined Oakfield's defense team.

801.15(4), Stats., prescribes five days advance notice, Oakfield asked the trial court to shorten the statute's notice requirements. The court denied this request and declined to substantively address Oakfield's motions.

Section 801.15(4), Stats., provides in part:

> A written motion, other than one which may be heard ex parte, and notice of the hearing thereof shall be served not later than 5 days before the time specified for the hearing, unless a different period is fixed by statute or by order of the court . . ..

The trial court's decision to shorten the statute's five-day notice requirement is a matter addressed to the court's discretion. *See Hedtcke v. Sentry Ins. Co.,* 109 Wis. 2d 461, 467, 326 N.W.2d 727, 730 (1982).

Viewed in isolation, Oakfield's request to shorten the statute's notice requirement by a few days does not have an unreasonable ring. However, the trial court considered the "ripple" effect of Oakfield's request: Eden had not been provided sufficient opportunity to respond to Oakfield's motions and supporting brief;[5] thus, the motion hearing would likely have to be adjourned to allow Eden time to prepare a response; this, in turn, would put the scheduled trial date (only seventeen days away) at risk.[6] Recalling that this was the fourth trial date, the court aptly observed that at some point "the expeditious trial of this matter becomes a paramount question." These reasons well support the court's decision not to shorten the statute's notice requirements.

---

[5] By our count, Oakfield's motion recited twelve grounds for dismissal of Eden's complaint.

[6] In fact, after the denial of its motions, Oakfield brought a motion seeking a fourth adjournment of the trial date so that the trial court could more fully address its motions.

■ The trial court's ruling was all the more correct given that the motions were, in part, for judgment on the pleadings and for summary judgment. A motion for judgment on the pleadings must be brought "within time so as not to delay the trial." Section 802.06(3), Stats. As we have already held, the trial court did not abuse its discretion in concluding that Oakfield's motion put the trial date at risk. Section 802.08, Stats., the summary judgment statute, provides that such a motion shall be brought within eight months of the filing of the action or within the time set out in the scheduling order. In addition, this statute provides that a summary judgment motion shall be served at least twenty days before the time fixed for hearing. Section 802.08(2). Oakfield's motion violated all three of these summary judgment time or notice requirements.

Oakfield contends that the trial court abused its discretion because the motions were dispositive of the case and would have avoided the necessity for trial. While again this is an argument with some facial appeal, it too loses luster under closer scrutiny. First, as some of the trial court's later rulings demonstrated, the motions did not prove to be dispositive.

■ Second, and more importantly, the trial court was not *required* to accept Oakfield's representations that the motions were dispositive of the entire case. Rather, the court was first required to address Eden's claim that the motions were untimely, and, if so, then to consider whether sufficient cause existed to deviate from the statute's notice requirements. Only then could the court address the motions on their merits. The court scrupulously followed this procedure. And, as we have already

held, the court's ruling was not an abuse of discretion.[7]

Continuances and delay are the bane of the judicial system. The adoption of the Wisconsin Rules of Civil Procedure represented a significant change from prior practice which permitted the attorneys to largely control the movement of cases through the judicial system. Under these new rules, this responsibility shifted principally to the trial courts. *See* Judicial Council Committee Note, 1974, sec. 802.10, Stats. (67 Wis. 2d 585, 637). In their judicial education programs, Wisconsin judges are now regularly instructed on the principles and techniques of efficient case management so as to avoid the disruptive and costly effect of repeated continuances and delay.

Perhaps in earlier and more leisurely times, the type of adjournment sought in this case would have been routinely granted. However, given the volume of litigation burdening the trial courts, the bar and litigants must understand that Wisconsin trial judges will monitor their calendars to avoid the damaging effects of unwarranted delay. In this case, the trial court properly exercised its responsibilities in this regard.

## TORTIOUS CONVERSION AND THE 1983 LEASE

Oakfield contends that the 1983 lease agreement between Eden and the Schraufnagels did not vest Eden with an exclusive right to quarry holey boulders on the Schraufnagel property nor with rights sufficient to permit a cause of action for conversion as to the holey boulders which Oakfield quarried. We disagree.

---

[7]*We do not criticize Attorney Krek for vigorously asserting Oakfield's interests when he belatedly came on the case. However, the equities on this discretionary issue support the trial court's ruling.*

## 1. Exclusivity

The lease reads in relevant part, "Schraufnagel has agreed with Eden Stone to grant to Eden Stone *exclusive right to quarry and remove stone* from Schraufnagel's premises . . .." (Emphasis added.) The trial court determined that this language was clear and unambiguous, entitling Eden to the exclusive right to quarry stone—including holey boulders—on the Schraufnagel farm.

The construction of a written contract is normally a matter of law for the court. *Ondrasek v. Tenneson,* 158 Wis. 2d 690, 694, 462 N.W.2d 915, 917 (Ct. App. 1990). We owe no deference to the trial court's construction of a contract. *See Hoeft v. United States Fire Ins. Co.,* 153 Wis. 2d 135, 140, 450 N.W.2d 459, 461 (Ct. App. 1989). When the terms of a contract are plain and unambiguous, we will construe the contract as it stands. *Borchardt v. Wilk,* 156 Wis. 2d 420, 427, 456 N.W.2d 653, 656 (Ct. App. 1990).

Oakfield attempts to build ambiguity into this lease on a number of fronts. First, Oakfield contends that because the lease does not specifically mention holey boulders, such stone was not included in Eden's quarrying rights. However, if we adopt Oakfield's reasoning, Eden could not quarry *any* stone since the lease also fails to specifically mention other kinds of stone. This would be an unreasonable interpretation and would totally frustrate the obvious intent of the parties.[8]

---

[8]Therefore, we conclude that the court properly answered "yes" to the first question of the special verdict which inquired:

At all times pertinent hereto did Eden Stone have a valid, exclusive

■ Second, Oakfield argues that the lease is ambiguous as to whether it applied to the area of the Schraufnagel property where Oakfield quarried holey boulders. However, the lease grants Eden the exclusive right to quarry on the *"Schraufnagel's premises."* This description of the premises is not restricted, limited or qualified in any manner. Oakfield points to certain testimony of Daniel Schraufnagel and Oakfield's representative, Rademann, that they *thought* Eden's lease rights were restricted to only a portion of the Schraufnagel property. But ambiguity does not result simply because someone contends, after the fact, that language which is clear on its face meant something other than what it plainly says.

■ The ultimate aim of all contract interpretation is to ascertain the intent of the parties. *Patti v. Western Machine Co.,* 72 Wis. 2d 348, 351, 241 N.W.2d 158, 160 (1976). If this intent can be determined with reasonable certainty from the face of the contract itself, there is no need to resort to extrinsic evidence. *Id.* Such is the case here. We affirm the trial court's interpretation of the 1983 lease.

---

possessory interest in the Schraufnagel farm for the purpose of quarrying stone?

We also reject Oakfield's claim that the inclusion of this essentially legal question in the verdict constituted reversible error. While it may have not been necessary to do so, we are not persuaded that any prejudice resulted to Oakfield. The lease was a central document to this entire lawsuit. The jury was entitled to know of its existence and its legal effect on Eden's rights. We see little difference between including this information in the special verdict by way of a question answered as a matter of law by the court or, alternatively, instructing the jury to the same effect.

## 2. Eden's Right to a Cause of Action in Conversion

We turn now to a question of first impression for purposes of Wisconsin conversion law. Oakfield argues that the law does not recognize a cause of action in conversion as to unquarried or unsevered stone. In support, Oakfield cites *Baker v. Hart,* 25 N.E. 948 (N.Y. 1890). This case does contain language which holds that an exclusive lease to quarry does not convey ownership of unsevered stone.

> The plaintiffs . . . were allowed to prove the value of the stone, and to recover that value on the theory that they owned it. But they did not. Their lease gave them no title to it. They did not cut or quarry it, and the ownership remained in their lessor.

*Id.* at 948. However, the *Baker* decision goes on to state:

> Undoubtedly the act of the defendants was an infringement of their [plaintiffs] rights for which they could recover such damages as they in fact sustained. But they proved none. *If the limits of their lease would have exhausted all the stone on the 25 acres, then certainly they would have lost the value of what was wrongfully removed; but if the supply was such that there remained for them all and more than they could quarry or remove, they at least lost no stone which they were entitled to have, for enough remained to fully satisfy their entire right.*

*Id.* (emphasis added). This latter language casts doubt as to whether *Baker* truly represents the bright-line rule which Oakfield urges. Instead, the totality of the *Baker* language suggests that the issue may really narrow to one of damages—not title.[9]

---

[9]Oakfield also cites *Smith v. El Paso Gold Mines, Inc.,* 720 P.2d 608 (Colo. Ct. App. 1985), in support of its position. In

However, even if we accept that *Baker* represents law supportive of Oakfield's position, other law holds to the contrary. In *Cage Brothers v. Whiteman,* 163 S.W.2d 638 (Tex. Comm'n App. 1942), the facts were much like those here. The competing parties, Whiteman and Cage Brothers, were both lessees making claim under separate leases from a common owner. The court concluded that Whiteman's rights under the first lease were superior to those obtained by Cage Brothers under a subsequent and more restrictive lease. *See id.* at 640-41. The court stated, "Earth, sand, and gravel while remaining in its original bed is a part of the realty and as such cannot be a subject of conversion; but where it has been wrongfully severed and removed, it becomes personalty for the conversion of which an action will lie." *Id.* at 641. Thus, the court concluded that Cage Brothers had converted the sand and gravel. We conclude that *Cage Brothers*—not *Baker*—represents the better reasoned law of conversion.[10] We adopt it here.

---

*Smith,* a creditor and debtor asserted competing claims to certain rock previously quarried by the debtor. "The primary issue . . . was the character of the rock for purposes of applying the statutes governing execution of judgments at the time execution was sought." *Id.* at 610. *Smith* did not involve a lease or a cause of action in conversion. We conclude that *Smith* is not applicable to the instant case.

[10]To the same effect is *Palumbo v. Harry M. Quinn, Inc.,* 55 N.E.2d 825 (Ill. App. Ct. 1944). There, Palumbo had received the right to remove topsoil from a former owner. He stripped the topsoil from the property and stored it thereon. When he sought to remove the stored topsoil, the subsequent property owner laid claim to the topsoil. Because the topsoil had been removed, the court concluded that the topsoil was personalty and subject to conversion. *Id.* at 828. The same is true in the case at bar: the

As the facts of this case demonstrate, Oakfield quarried and severed the disputed holey boulders from the Schraufnagel property. As such, the holey boulders became personalty and subject to conversion.

## THE *PIERRINGER* RELEASE/ INDEMNIFICATION

### 1. The *Pierringer* Release

Eden included the Schraufnagels as defendants in its complaint. Pretrial, Eden settled with the Schraufnagels, giving a release with *Pierringer*-type language.[11] From this Oakfield reasons: (1) that Eden stands in the Schraufnagels' shoes; (2) that the Schraufnagels are the more culpable tortfeasors; and (3) as a result, indemnification principles entitle Oakfield to the dismissal of Eden's complaint. We disagree.

The trial court construed Eden's complaint against the Schraufnagels to state a cause of action in contract—not tort. As such, the court did not give any effect to the word "Pierringer" or the *Pierringer*-type language in the release. We agree.

Eden's complaint alleges that the "Defendant Daniel Schraufnagel, *in violation of the exclusive lease* with Plaintiff, contracted with Defendant Rademann [Oakfield] for the quarring [sic] and removal of holey boulders from the leased lands . . .." (Emphasis added.) This language is plain and clear. It alleges a breach of the lease contract by the Schraufnagels. It does not allege a

---

disputed holey boulders have been quarried or severed; thus, they are legally capable of being converted.

[11]*Pierringer v. Hoger*, 21 Wis. 2d 182, 124 N.W.2d 106 (1963).

119

tort. Regardless of whether Eden and the Schraufnagels consciously used a release with *Pierringer*-type language, this did not operate to amend Eden's complaint. A release is neither a pleading nor a motion to amend pleadings.

It is axiomatic that a *Pierringer* release can only function in a setting involving joint tortfeasors. *See Pierringer v. Hoger,* 21 Wis. 2d 182, 124 N.W.2d 106 (1963). We see nothing in the *Pierringer* decision which envisions the use of such releases in any other setting. And the ensuing development of *Pierringer* law has never extended or recognized the use of such releases where one defendant is sued in contract and another in tort.

### 2. Oakfield's Proposed Indemnity Verdict and Instructions

On the same indemnity theme, but with a different variation, Oakfield argues that the trial court erred by refusing to submit special verdict questions and jury instructions which would have permitted the jury to assess the nature and quality of the Schraufnagels' conduct in this matter. Oakfield argues that if the jury had performed this task, the court then could have determined which party (Oakfield or the Schraufnagels) engaged in the more egregious conduct and ordered the more culpable party to indemnify the less culpable.

Oakfield's argument, however, would have us bestow the right of indemnification on itself as an intentional tortfeasor.[12] This, we conclude, the law does not permit.

---

[12]We will later in this opinion affirm the trial court's determination as a matter of law that Oakfield intentionally converted

Although stated in terms of contribution, the Wisconsin Supreme Court has held that "a person whose liability to plaintiff arose from his intentional wrong is not entitled to contribution." *Jacobs v. General Accident Fire & Life Assurance Corp.*, 14 Wis. 2d 1, 5, 109 N.W.2d 462, 464 (1961). Although *Jacobs* involved gross negligence, a concept since discarded, the court equated gross negligence with intentional wrongdoing. *See id.* In short, Wisconsin law does not allow indemnity to an intentional tortfeasor.[13]

## EVIDENCE: THE 1989 LEASE

In 1989, Eden and the Schraufnagels entered into a lease agreement which replaced the 1983 lease.[14] Oak-

---

Eden's property and the jury's determination that Oakfield knew that such conversion was wrongful.

[13] Although we ultimately agree with Eden on the indemnification issue, we reject Eden's argument that Oakfield is not entitled to indemnification because it did not plead for such relief by way of counterclaim, cross-complaint or third-party complaint. *Fleming v. Threshermen's Mutual Insurance Company*, 131 Wis. 2d 123, 388 N.W.2d 908 (1986), holds that such a pleading is not necessary. *Id.* at 128, 388 N.W.2d at 910.

We also reject Oakfield's claim that *Fleming* supports its claim for indemnification on the basis of the Schraufnagels' conduct. *Fleming* holds that *as between an intentional tortfeasor and a negligent tortfeasor,* the latter is entitled to indemnification from the former. Here, however, the roles are reversed. Oakfield, the intentional tortfeasor, seeks indemnification. Such a wrongdoer is not entitled to indemnification under Wisconsin law.

[14] The 1983 lease recited a five-year term with options to renew. The record is silent as to whether this lease had been renewed when the five-year term expired in 1988. Regardless, Oakfield's tortious conversion occurred during 1987 while the 1983 lease was in effect.

field contends that this new lease demonstrated the ambiguity of the 1983 lease agreement. Thus, Oakfield argues that the trial court should have admitted the 1989 lease into evidence.

However, we have already concluded that the 1983 lease agreement was clear and unambiguous in giving Eden an exclusive right to quarry stone—including holey boulders—on the entire Schraufnagel property. If contracting parties later renegotiate their agreements and, in the process, choose to use different or more precise language, this does not necessarily render their original agreement ambiguous. Plain and unambiguous agreements stand on their own and are construed accordingly. Here the trial court correctly ruled that the 1983 lease governed Eden's rights—not the new 1989 agreement negotiated after Oakfield's conversion was completed.[15]

## OTHER ISSUES CONCERNING THE SPECIAL VERDICT

Question six of the special verdict, pertaining to Eden's conversion cause of action, inquired:

> Did Oakfield Stone at some time or times intentionally and without Eden Stone's consent or lawful authority remove quantities of Niagara dolomite stone from the Schraufnagel farm, and deny Eden Stone the possession and use of the same?

[15]Eden also argues that the 1989 lease was properly excluded under sec. 904.08, Stats. This statute, subject to certain exceptions, precludes evidentiary use of compromises or offers of compromise. Apparently the 1989 lease was the result, in part, of the settlement negotiations between Eden and the Schraufnagels. Because we have otherwise affirmed the trial court's evidentiary ruling excluding the evidence, we need not address this argument.

The trial court answered this question "yes."

Oakfield contends that it legitimately believed that it had the right to quarry holey boulders from the Schraufnagel property. Thus, Oakfield contends that a factual dispute for the jury existed on this question. This, however, was not the basis for Oakfield's objection to the trial court's answering of question six. Instead, the gravamen for Oakfield's objection was the trial court's previous decision to answer "yes" to the first question of the special verdict which inquired as to whether Eden had an exclusive right to quarry on the Schraufnagel farm. Oakfield apparently concluded that the answer to question one made any objection to question six academic. Since we have already concluded that the court's answer to the exclusivity question was correct, we have no other trial court ruling on this question to review. The grounds asserted by Oakfield on appeal are not those raised in the trial court and the issue is waived. *See Wirth v. Ehly,* 93 Wis. 2d 433, 443-44, 287 N.W.2d 140, 145 (1980).

However, even addressing Oakfield's argument on the merits, we see no error in the trial court's answer to question six. The evidence was undisputed that Oakfield intentionally removed holey boulders from the Schraufnagel farm, that such removal was without Eden's consent, and that such activity denied Eden the possession and use of the boulders. Thus, Oakfield's tortious conversion was completed. *See* Wis J I—Civil 2200.[16]

---

[16]Oakfield also challenges the trial court's "yes" answer to question nine concerning Eden's trespass cause of action. This question inquired, "Did Oakfield Stone at some time or times intentionally and without Eden Stone's consent or lawful authority enter upon the Schraufnagel farm?" We do not address this

The trial court's answer to question six should have put the conversion issue to rest. However, without objection from Eden, the special verdict unnecessarily went on to inquire whether Oakfield knew that its taking was wrongful. Apparently both parties believed that wrongful or unlawful intent is an element of tortious conversion. It is not. *See id.* Thus, Oakfield was gratuitously extended the opportunity to argue its various theories of defense—including that it was an unwitting and innocent participant, duped by the Schraufnagels into believing that it (Oakfield) had full right to go upon the Schraufnagel farm and remove holey boulders—despite the fact that Eden had already proved its case.

## DAMAGES

Oakfield contends that the evidence does not sustain the jury's award of $347,401 to Eden for the loss of the holey boulders converted by Oakfield.

We will not recite in detail all the competing evidence on this question. We do observe, however, that Eden presented the testimony of Dr. Gene LaBerge, a professor of geology, who had examined the excavated site and calculated the tonnage of holey boulders allegedly removed by Oakfield. In some instances, Dr. LaBerge's calculations actually accounted for certain of Oakfield's challenges and he gave the "benefit of the doubt" to Oakfield in these areas. Building upon Dr. LaBerge's tonnage calculations, Eden then introduced evidence of its lost net profit based on the market value of the stone allegedly converted.

Against this testimony, Oakfield presented evidence of the weight slips it gave to Daniel Schraufnagel for the

issue further because the jury's award of one dollar nominal damages renders the issue *de minimis.*

holey boulders Oakfield claimed to have quarried on the Schraufnagel property. This evidence, not unexpectedly, revealed a lower tonnage amount than that testified to by Dr. LaBerge. However, an Oakfield employee testified that these holey boulders were commingled with those quarried from another property *before* the boulders were weighed. This evidence raised questions concerning the integrity of Oakfield's weighing methods and the credibility of the resulting weight slips. This concern was heightened when other evidence suggested that weight slips given to another supplier of holey boulders to Oakfield were not in accord with Oakfield's corresponding business records.

■■■■

Damages must be proven with reasonable certainty. *Cutler Cranberry Co. v. Oakdale Elec. Coop.,* 78 Wis. 2d 222, 233, 254 N.W.2d 234, 240 (1977). However, there is no absolute requirement of mathematical precision, and the fact that the full extent of the damages is a matter of uncertainty *by reason of the nature of the tort is not a ground for refusing damages. Id.* It is generally held that the uncertainty which prevents recovery is uncertainty as to the fact of the damage and *not to its amount. Id.* at 234, 254 N.W.2d at 240. This rule is applied where, from the nature of the case, the extent of injury and the amount of damage are not capable of exact and accurate proof. *Id.*

The instant case is one which invokes the above factors. The fact of damage in this case is certain; the extent of the damage is uncertain. The fixing of damages for the loss of converted unrecovered property is, by its very nature, uncertain. In such cases, the extent of the damage will rarely be capable of exact or precise proof. As a result, estimates are likely to be the only available evidence—and therefore the best evidence.

■■■

Thus, the damage issue in this case was properly for the jury based on the credibility of the witnesses and the weight of the evidence. Eden's evidence supports the jury's determination. We do not disturb the award.[17]

*By the Court.*—Judgment affirmed.

■■■

---

[17]For these same reasons, we reject Oakfield's request that we reduce the damage award to some lower figure.