Myron A. GOLDSTEIN and Park Family Limited Partnership, Plaintiffs-Appellants,†

v.

James R. LINDNER, Joan C. Lindner, David A. Norrbom, Kathleen M. Norrbom, Robert J. Lindner, Debra J. Lindner, Lindner Minerals Limited Partnership, Raymond Hoffman, Maymie Hoffman, John C. Bojarski, Northwoods Minerals Limited Partnership, Wilderness Minerals Limited Partnership, Mineral Heights Limited Partnership, Forest Minerals Limited Partnership, Woodland Minerals Limited Partnership, Christine M. Flamme, Julianne Koll, Clara D. Michailoff, Joyce D. Nemec, Antonette Ehrenberg and Nicolet Minerals Company, Defendants-Respondents.

Court of Appeals

*No. 01–2068. Submitted on briefs March 11, 2002.—Decided April 9, 2002.*

2002 WI App 122

(Also reported in 648 N.W.2d 892.)

† Petition to review denied 9-3-02.

675

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Francis R. Croak, Michael J. Lund* and *Steven L. Nelson* of *Cooke & Franke S.C.*, Milwaukee.

On behalf of the defendants-respondents, the cause was submitted on the brief of *William Schroeder* of *Sommer, Olk, Schroeder & Payant*, Rhinelander and *James L. Huston* and *Kelli Taffora* of *Foley & Lardner*, Milwaukee.

Before Cane, C.J., Hoover, P.J., and Peterson, J.

¶ 1. PETERSON, J. Myron Goldstein and the Park Family Limited Partnership (Goldstein) appeal a summary judgment dismissing their complaint seeking declaratory relief with respect to their interest in mineral rights. Because we agree with the circuit court that there are no genuine issues of material fact, we affirm the judgment.

## BACKGROUND

¶ 2. This case involves a forty-acre parcel of land in the Town of Nashville. On February 1, 1975, Ernest and Antonette Ehrenberg, owners of the parcel, signed a twenty-five-year mining lease with Exxon Corporation. The mining lease granted Exxon the right to conduct mining operations on the parcel.[1]

¶ 3. In May 1976, the Ehrenbergs assigned a one-half interest in the 1975 mining lease to James

---

[1] The mining lease itself was never recorded, but a memorandum agreement describing the lease was recorded in April 1975.

Lindsay. The assignment conveyed half of the "royalties and/or contractual interests" arising out of the 1975 mining lease. In addition, the assignment gave Lindsay the right to explore and mine the parcel in the event Exxon terminated the lease.[2] In 1979, Frederick Park and Goldstein each purchased one-third of Lindsay's "royalties and/or contractual interests."[3]

¶ 4. In 1981, James Lindner secured the right to purchase the Ehrenbergs' remaining interest under the 1975 mining lease.[4] Under an option agreement, Lindner had the right to purchase the Ehrenbergs' share of production royalties and rental payments. The option agreement has since been exercised. In addition, the Ehrenbergs assigned to Lindner "any and all other financial or beneficial rights" under the mining lease "including any reversionary rights in the lease."[5]

¶ 5. Exxon pursued state and federal permits to open the mine. In late 1986, it withdrew its permit applications because future mineral prices were not promising. The permit process was started again in 1993 by Crandon Mining Company. Crandon Mining was a Wisconsin partnership of Exxon Corporation and Rio Algom, Ltd.

[2] The Lindsay assignment states that in the event Exxon terminated the 1975 mining lease, "Lindsay, his heirs and assigns shall have the right to go upon the premises" and "extract the mineral deposits" from the property.

[3] Frederick Park assigned his interest on August 3, 2000, to the Park Family Limited Partnership.

[4] Joan Lindner, David Norrbom, and Kathleen Norrbom also secured the right to purchase the Ehrenbergs' rights under the 1975 mining lease.

[5] In the 1980s, fractional interests in the parcel were conveyed to the individual defendants named here and to W.A. Mines, Inc., an Exxon subsidiary.

¶ 6. On September 22, 1997, Lindner and Crandon Mining entered into a new twenty-five-year mining lease to commence on February 1, 2000, the date the 1975 mining lease was to expire. Section 17 of the 1997 lease ratifies and reaffirms the 1975 mining lease and provides "that as of February 1, 2000, the 1975 Lease shall be superseded by this Lease in all respects as to the interest in the Premises leased hereby." The "interest in the Premises leased hereby" refers to the Ehrenbergs' one-half interest in the 1975 mining lease that Lindner purchased.

¶ 7. In 1998, Rio Algom purchased Exxon's interest and the partnership was renamed Nicolet Minerals Company. Nicolet Minerals continues to seek permits for the mine.

¶ 8. Goldstein filed this action against Nicolet Minerals, Antonette Ehrenberg[6] and Lindner, seeking declaratory relief with respect to his interest in the parcel. Goldstein moved for summary judgment, arguing that: (1) he possesses a one-half interest in the reversionary interest under the mining lease; (2) he has the right to conduct mining operations pursuant to the Lindsay assignment; and (3) Nicolet Minerals terminated the mining lease.

¶ 9. Nicolet Minerals, Ehrenberg, and Lindner filed a motion for summary judgment seeking dismissal of Goldstein's complaint. The circuit court granted their motion and denied Goldstein's motion. The court held that Goldstein had not acquired the Ehrenbergs' reversionary interests and that Nicolet Minerals did not terminate the lease.

---

[6] Ernest Ehrenberg died prior to the commencement of this lawsuit. Antonette Ehrenberg was alive at the time the complaint was filed, but has since died.

## STANDARD OF REVIEW

¶ 10. When reviewing a grant of summary judgment, we apply the same methodology as the trial court and decide independently whether summary judgment was appropriate. *Coopman v. State Farm Fire & Cas. Co.*, 179 Wis. 2d 548, 555, 508 N.W.2d 610 (Ct. App. 1993). If the pleadings set forth a claim for relief and a material issue of fact, our inquiry shifts to the moving party's affidavits or other proof to determine whether a prima facie case for summary judgment has been presented. *Grams v. Boss*, 97 Wis. 2d 332, 338, 294 N.W.2d 473 (1980). If the moving party has made a prima facie case, the affidavits or other proof of the opposing party must be examined to determine whether there are disputed material facts, or undisputed material facts from which reasonable alternative inferences may be drawn, sufficient to entitle the opposing party to a trial. *Id.*

## DISCUSSION

I. Reversionary Interests

¶ 11. Based on the Lindsay assignment, Goldstein argues that he possesses a one-half interest in the Ehrenbergs' reversionary interest in the 1975 mining lease. As a result of the use of "and/or" in the Lindsay assignment, Goldstein contends that the Lindsay assignment is ambiguous. According to Goldstein, the Ehrenbergs intended to convey not only royalties and other contractual interests arising from the 1975 mining lease, but also their reversionary interest in the property.

¶ 12. Contracts are construed to achieve the parties' intent. *Eden Stone Co. v. Oakfield Stone Co.*, 166 Wis. 2d 105, 116, 479 N.W.2d 557 (Ct. App. 1991). The terms used in a contract are to be given their plain or ordinary meaning. *In re All-Star Ins. Corp.*, 112 Wis. 2d 329, 333, 332 N.W.2d 828 (Ct. App. 1983). The analysis ends if the words convey a clear and unambiguous meaning. *Eden Stone Co.*, 166 Wis. 2d at 116. "If [the parties'] intent can be determined with reasonable certainty from the face of the contract itself, there is no need to resort to extrinsic evidence." *Id.*

¶ 13. The passage at issue in the Lindsay assignment states that the Ehrenbergs "do hereby grant, bargain and convey unto said James B. Lindsay, one half (1/2) or Fifty Percent (50%) of the royalties and/or contractual interests" arising out of the 1975 mining lease. When contractual terms are reasonably susceptible to more than one construction, the contract is ambiguous. *Gorton v. Hostak, Henzl & Bichler*, 217 Wis. 2d 493, 506, 577 N.W.2d 617 (1998). The very nature of "and/or" is ambiguous because it renders a contract susceptible to three interpretations. Here, those interpretations are: (1) one-half of the royalties; (2) one-half of the contractual interests; or (3) one-half of both the royalties and contractual interests.

¶ 14. However, this ambiguity makes no difference in resolving this dispute. Regardless which of the three alternatives was conveyed, none includes a reversionary interest.

¶ 15. Unlike royalties and contractual interests, a reversion is not an interest that arises from a contract. Rather, a reversion "arises by construction and opera-

tion of law whenever a grantor has conveyed less than his whole interest or estate" the undisposed portion being his when the grant is terminated. 31 C.J.S. *Estates* § 104 (1996). Other authorities agree that reversionary interests arise by operation of law and not from contracts. BLACK'S LAW DICTIONARY 1320 (7th ed. 1999), defines a reversion as a "future interest in land arising by operation of law whenever an estate owner grants to another a particular estate, such as . . . a term of years." "[R]eversions arise by operation of law, and not by any act of a party." 28 AM. JUR. 2d *Estates* § 197 (2000).

¶ 16. By the Lindsay assignment's terms, the Ehrenbergs intended to convey either royalties, contractual interests, or both, to Lindsay. However, nothing suggests that the Ehrenbergs also intended to give up their reversionary interest in the 1975 mining lease. The first time that reversion is found in the chain of title is when the Ehrenbergs conveyed their reversion to Lindner in the option agreement. The option agreement expressly included "any reversionary rights in the [1975 mining lease]."

¶ 17. Yet Goldstein argues that a one-half interest in the Ehrenbergs' reversionary interest under the 1975 mining lease was conveyed in the Lindsay assignment. Goldstein ignores the plain meaning of reversion and does not explain how either "royalties" or "contractual interests"[7] can be construed to mean a reversionary

---

[7] "Contractual interests" here included, for example, the Ehrenbergs' right to require Exxon to conduct all operations in a careful and "miner-like" manner; the Ehrenbergs' right to be indemnified by Exxon for personal injuries and property damage to third parties; the Ehrenbergs' right to assign interests in the lease; the Ehrenbergs' right to terminate the lease if Exxon defaulted; Exxon's promise to pay its proportionate share of

interest. Goldstein cites no authority describing a reversionary interest as a royalty or a contractual interest or as something that arises from a royalty or a contract.

¶ 18. We conclude that there is no material ambiguity in the Lindsay assignment. Lindsay and his assignees did not acquire a one-half interest in the Ehrenbergs' reversionary interest in the 1975 mining lease.

II. TERMINATION OF THE MINING LEASE

¶ 19. The 1997 mining lease between Lindner and Crandon Mining includes an undivided 50% interest in the parcel and has a term of twenty-five years commencing February 1, 2000. Section 17 of the 1997 mining lease provides that "as of February 1, 2000, the 1975 Lease shall be superseded by this Lease in all respects as to the interest in the Premises leased hereby."

¶ 20. Goldstein argues that the 1975 mining lease continued in effect beyond February 1, 2000, either: (1) under its express terms or (2) under its force majeure provisions. Therefore, according to Goldstein, Crandon Mining terminated the lease and, as a result, Goldstein possesses the right to mine the parcel, pursuant to the terms of the Lindsay assignment.

A. Express Terms of the Mining Lease

¶ 21. Goldstein argues that the mining lease continued in effect for at least 180 days after its initial term. The first sentence of Section Two of the 1975 mining lease reads:

---

severance taxes on minerals mined from the parcel; and Exxon's promise to keep title free of all liens or encumbrances resulting from its activities.

> This Lease is granted for an initial term of twenty-five (25) years from and after the date hereof, and for a continuing term as long after the initial term as any mining, development or processing is being conducted hereunder on a continuous basis.

By itself, this sentence means that the lease ran for twenty-five years plus any period in which mining or development work continued.

¶ 22. The second sentence in Section Two states:

> Such operations shall be deemed conducted on a continuous basis unless and until, after the end of the initial term, a period of one hundred eighty (180) consecutive days elapses in which no mining or development or processing is conducted, excluding, however, periods of force majeure as defined below.

Read together, the two sentences describe a twenty-five-year initial term that would be extended if the mine was in operation at the end of the initial term. During this "continuing term," the mining company could suspend mining operations up to 180 days for any reason without losing its lease.

¶ 23. Goldstein also relies on Section Three and Section 7–3 of the 1975 mining lease. Section Three states:

> Lessee shall pay Lessor an annual payment, except as otherwise provided herein, of rental or advance royalty determined according to the schedule and provisions contained in this Section.

The second sentence of Section 7–3 states:

> Each annual payment, whether rental or advance royalty, shall been deemed, during the initial term of this Lease, the equivalent of reasonable development and working of the premises for all purposes of this Lease . . . .

684

Goldstein argues that by making the required annual payments during the 1975 mining lease, Exxon and its successors were deemed to be developing and working the premises "for all purposes." Therefore, Goldstein concludes that the 1975 mining lease extended beyond February 1, 2000, by at least 180 days.

¶ 24. In order to fully protect the lessor, courts have found that a mining lease "automatically terminates by its own terms upon the occurrence of the stated event, namely, expiration of the primary term without production or operations at such time . . . ." *McCullough Oil, Inc. v. Rezek*, 346 S.E.2d 788, 794 (W. Va. 1986). *McCullough Oil*'s discussion of oil, gas and mineral leases is instructive. *Id.* at 792–94. Term clauses typically include three elements. One element sets the primary term of the lease, which is to bring the project into commercial production. *See id.* at 792–93. Here, the lease was for twenty-five years. The second element is a "thereafter" provision creating a continuing term that took effect if the mining company achieved production during the primary term and extended for as long as commercial production continued. *See id.* at 793. Here, the first sentence of Section Two states both the primary and the "thereafter" or continuing term, and the second sentence defines what triggered the continuing term.

¶ 25. In addition, leases often contain a third element, a "savings" or "cessation of production" clause, intended to give the lessee a grace period. *Id.* Under these clauses, the continuing term does not expire if production, once begun but temporarily suspended, was resumed within the period specified. *See id.* at 793–94. Here, the "savings" clause is found in the second sentence of Section Two and provides for a 180–day grace period.

¶ 26. Contrary to Goldstein's argument, Section 7-3 has nothing to do with the lease term. Rather, it reflects the fact that mining companies have a duty to take reasonable steps toward developing a leasehold. *See, e.g., Leck v. Cont'l Oil Co.*, 800 P.2d 224, 228 (Okla. 1989) (all mining leases contain the lessee's implied promise to develop the leasehold as a prudent operator). The principal consideration for lessors is their expectation of receiving royalties, and lessees have an obligation to act with diligence to satisfy that expectation. *See Morley v. Berg*, 235 S.W.2d 873, 874–75 (Ark. 1951).

¶ 27. In other words, Section 7-3 creates a safe harbor, providing that the annual payments required by the lease are "the equivalent of reasonable development and working of the premises . . . ." As long as payments were made, the mining company's failure to develop the mine during the 1975 mining lease would not breach the implied covenant of development. Therefore, the 1975 mining lease expired by its terms on February 1, 2000.

¶ 28. Goldstein argues that the language in the 1997 mining lease, "as of February 1, 2000, the 1975 Lease shall be superseded by this Lease," is equivalent to termination of the 1975 mining lease. However, the 1975 mining lease did not recognize termination by supersession. Rather, under Section 11-2 of the 1975 mining lease, the only way in which the lease could be terminated was by "delivering or mailing Lessor written notice stating such intention to terminate . . . . The termination shall take effect upon the date specified in the notice or, if no date is specified, upon the date on which the notice is given." Here, no notice has ever been

given. Neither Exxon, nor any of its successors, ever gave notice that the lease was to be terminated.

B. Force Majeure

¶ 29. Goldstein also argues that the 1975 mining lease remained in effect pursuant to its force majeure clause. He contends that the combination of private and governmental inaction constituted an event of force majeure.

¶ 30. As stated earlier, the 1975 mining lease was for "an initial term of twenty-five years" and "a continuing term as long after the initial term as any mining, development or processing is being conducted hereunder on a continuous basis." Whether "mining or development or processing is conducted" is determined in accordance with Section Twelve of the 1975 mining lease:

> Lessee shall not be deemed . . . to have ceased performance or operations hereunder, during any period in which performance or operations are prevented by any cause reasonably beyond Lessee's control, each of which causes is called "force majeure." Force majeure shall include, without limitation . . . inability to obtain competent workmen . . . lack of market reasonably satisfactory to Lessee for product from the premises, action of government authority, litigation . . . . The duration of this lease shall be extended for a period equal to the period of force majeure.

¶ 31. Under Section Twelve, force majeure existed when non-performance resulted from something beyond the lessee's control. Force majeure clauses extend leases only when the non-performance is "caused by circumstances beyond the reasonable control of the lessee or by an event which is unforeseeable at the time the parties entered into the contract." *Atkinson Gas Co.*

687

*v. Albrecht,* 878 S.W.2d 236, 241 (Tex. App. 1994). Parties to a lease are assumed to know what laws and regulations will affect the company's ability to win permits. *Id.* For that reason a lessee's failure to secure a permit is not deemed an event of force majeure. *Id.*

¶ 32. In *Erickson v. Dart Oil & Gas Corp.,* 474 N.W.2d 150, 155–56 (Mich. Ct. App. 1991), the Michigan appellate court held that the government's failure to issue drilling permits did not constitute force majeure. In that case, the primary term of the lease expired before the lessee was able to obtain the necessary permits. *Id.* In analyzing the lessee's resort to the force majeure clause, the court first noted that "Where governmental action is alleged to be the cause of delay, the parties to the lease are presumed to have contracted with knowledge of any preexisting law that could have caused delay." *Id.* at 155. The court held that the failure to obtain the necessary permits was not force majeure. *Id.*

¶ 33. Here, Nicolet Minerals has not obtained the state and federal permits necessary to begin mining. In large part, there are no permits because Exxon voluntarily suspended its applications in 1986. There was no further action until 1993, when Exxon joined with Rio Algom and the application process started over. Nicolet Minerals was not able to satisfy all of the permitting agencies' requests for information about the mining plan by the time the 1975 mining lease expired.

¶ 34. The primary reason that force majeure did not extend the 1975 mining lease is that only the lessee can invoke the clause. The last sentence of Section Twelve provides that "Lessee shall notify Lessor of the beginning and ending date of such period" of force

majeure. Because neither Exxon nor Nicolet Minerals ever gave notice, the force majeure clause has not been triggered.

¶ 35. Even if there were doubt whether Exxon or Nicolet Minerals could invoke the force majeure clause before actual operations began, the last sentence of Section Twelve makes clear that periods of force majeure begin "at the time Lessee stops performance or operations hereunder by reason of force majeure." Because the lessee never stopped performance and there were never any mining operations that could be stopped, there was never a time when the force majeure clause could have been invoked.

*By the Court.*—Judgment affirmed.