James W. WHITE, Appellant,

v.

STATE of Alaska, DEPARTMENT OF NATURAL RESOURCES, Appellee.

No. S–8089.

Supreme Court of Alaska.

Aug. 13, 1999.

---

**35.** 614 P.2d 321 (Alaska 1980).

**36.** *See id.* at 322–23.

**37.** *Id.* at 324–25 (footnote omitted).

Robert C. Ely, Ely & Havelock, Jody P. Brion, Brion, Edgren & Goff, LLC, Anchorage, for Appellant.

Lawrence Z. Ostrovsky, Assistant Attorney General, Anchorage, Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, and BRYNER, Justices.

## OPINION

MATTHEWS, Chief Justice.

### I. INTRODUCTION

The Tucson Group leased land from the State of Alaska for possible oil and gas exploration. The Tucson Group later assigned the lease to James White. The Department of Natural Resources (DNR) did not approve the assignment because it concluded that the lease between the Tucson Group and the State had expired. The Commissioner of DNR affirmed this decision.

The lease contained numerous provisions that would automatically extend its term provided that certain conditions were met. White argues that he was entitled to a hearing concerning whether he met the conditions of one of these automatic extension provisions. We agree and remand for a hearing on that particular issue. We affirm the Commissioner's decision on all other grounds.

### II. FACTS AND PROCEEDINGS

In 1962 Unocal drilled a 14,940 foot oil well on an onshore, privately owned tract of 117 acres of land (the "McCoy property"). The well did not go straight down; rather, it was a directionally drilled well that deviated into adjacently located state land offshore. The well was not developed, and Unocal plugged and abandoned it in 1962. It was plugged at the following depths: 3,718 feet; 7,400 feet; 10,350 feet; and 12,600 feet.

On December 1, 1983, DNR issued oil and gas lease 359242, an offshore tract adjacent to the McCoy property; it contained approximately 2,433 acres. The lessees were Simasko Production Co., Paul Gavora, James Thurman, and Tucson Ltd. (collectively the "Tucson Group"). This lease had a seven-year term, which expired at midnight on November 30, 1990. Paragraph 4 of the lease contained provisions for automatic extensions that were contingent upon certain conditions.

In 1985 White's company, Far North Oil and Gas ("Far North"), received the rights to develop the previously abandoned onshore well located on the McCoy property. The Alaska Oil and Gas Conservation Commission (AOGCC) granted White permission to "reenter the [McCoy] well to explore for hydro-carbon production." Far North applied for and was granted a permit to reenter the well to a depth of 3,850 feet. On November 30, 1990, the last day of the lease between the State and the Tucson Group, a company associated with White, Conquest Petroleum, submitted the next year's rental payment on the Tucson Group's lease.

The lease expired at midnight on November 30, 1990. On December 17 DNR sent a notice to the Tucson Group that the lease had expired. None of the members of the Tucson Group appealed this determination. Nevertheless, between December 12, 1990 and January 4, 1991, the members of the Tucson Group attempted to assign their rights to the lease to White. White applied for DNR approval of these assignments on March 7, 1991, but DNR denied his application because the "oil and gas lease [between the State and the Tucson Group] expired on November 30, 1990." In a June 20, 1991 letter, the Director of DNR's Division of Oil and Gas confirmed the denial of the assignment of lease rights to White because the lease expired on November 30, 1990, and because White was "neither the designated operator nor an owner at the time of expiration." The rent that had been submitted on November 30, 1990, to cover the following year's rental payment was then returned to White's attorney by DNR. In 1987 and 1992 the AOGCC requested completion reports from Far North concerning its work on the McCoy well as required by AAC 25.070, but White did not submit these reports until January 4, 1993.

White appealed the Director's decision to the DNR Commissioner. White argued that the lease between the State and the Tucson Group had not expired because the conditions of at least one of the automatic extension provisions in paragraph 4 of the lease had been met. Therefore, White claimed, the Tucson Group had the authority to assign its lease to him. White also requested a hearing so that the Commissioner could determine the factual issues relating to his case. In particular he sought a hearing to determine the bottom hole location of the McCoy well.

Without granting a hearing, the Commissioner affirmed the Director's denial of White's application for assignment of the Tucson Group's lease to him. After analyzing each of the automatic extension provisions claimed by White, the Commissioner concluded: "The lease, ADL 359242, expired at the end of the primary term, on November 30, 1990. None of the provisions of Paragraph 4 of the lease would apply to automatically extend the term of the lease." The Commissioner then articulated each of the lease extension provisions he had rejected:

The lessees of record did not apply for unitization of the lease nor did the state prescribe unitization. The lessees had not commenced drilling a well prior to the expiration date of the lease[, and] there was no well capable of producing in paying quantities on the lease. The assignment applications were submitted after the lease expired.

White appealed this decision to the superior court, which affirmed the Commissioner's decision. He now appeals the superior court's decision.

### III. DISCUSSION

#### A. Standard of Review

In an appeal from a judgment of a superior court acting as an intermediate court of appeal, we independently and directly review the agency decision.[1] We review an administrative agency's findings of fact for substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[2] "[W]here the questions at issue implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function," we use the rational basis standard of review.[3] "The ra-

tional basis approach merely determines whether the agency's determination is supported by the facts and is reasonably based in law."[4]

#### B. Was the Lease Automatically Extended by a "Unit Agreement Approved or Prescribed by the State"?

Paragraph 4(b) of the lease states that "[t]his lease will be extended automatically if it is committed to a unit agreement[5] approved or prescribed by the state, and will remain in effect for so long as it remains committed to that unit agreement." The Commissioner found that it "was simply not the case" that the lease was committed to a unit agreement because no such agreement was "approved or prescribed" by the State. We agree.

"Unit agreements" are "executed by the State of Alaska, working-interest owners, and royalty owners creating the unit."[6] Paragraph 4(b) of the lease expressly requires a unit agreement to be "approved or prescribed by the state." Contrary to White's assertions, unit agreements do not arise "automatically" without the State's involvement. In this case, the State never approved or prescribed a unit agreement. Therefore, White's argument that the McCoy property and the State's lease were committed to a unit agreement is without merit.

We also reject White's related claim that the lease extension provision of paragraph 4(d) applies because there was a well "on the leased area." This argument is premised on the assumption, rejected above, that there was a unit agreement existing between the leased property and the McCoy well property, creating "a single unit" property. In fact, the McCoy well is located on

1. See Cook Inlet Pipe Line Co. v. Alaska Pub. Utils. Comm'n, 836 P.2d 343, 348 (Alaska 1992).

2. Handley v. State, Dep't of Revenue, 838 P.2d 1231, 1233 (Alaska 1992) (quoting Keiner v. City of Anchorage, 378 P.2d 406, 411 (Alaska 1963)).

3. Hammer v. City of Fairbanks, 953 P.2d 500, 504 (Alaska 1998) (quotations omitted).

4. Id.

5. A "unit agreement" is "[a]n agreement or plan of development and operation for the recovery of oil and gas made subject thereto as a single consolidated unit without regard to separate ownerships and for the allocation of costs and benefits on a basis as defined in the agreement or plan." Howard R. Williams & Charles V. Meyers, 8 Oil and Gas Law 1315 (1992).

6. 11 AAC 83.395(8).

property that is separate and distinct from the leased property. Accordingly, we agree with the Commissioner that the lease extension provision of paragraph 4(d) does not apply because there was not a well "on the leased area."

C. *Was White Entitled to a Hearing on the Issue of whether the McCoy Well's Bottom Hole Was Located in "the Leased Area"?*

Paragraph 4(c)(1) of the lease allows for the automatic extension of the lease "[i]f the drilling of a well whose bottom hole [7] location is in the leased area has commenced as of the date on which the lease otherwise would expire and is continued with reasonable diligence." White argued to the Commissioner that the bottom hole of the McCoy well did extend under the State lease. He specifically requested a hearing before the Commissioner so that he could determine "[t]he location of the bottom hole drilled on McCoy Prospect No. 1 with reference to [the State's leased property]."

Without explanation, the Commissioner did not grant White a hearing. The Commissioner also rejected White's argument that the McCoy well's bottom hole was located under the leased property:

> [P]aragraph 4(c)(1) requires that the "bottom hole" of the well be in the leased area. Again, such was simply not the case. It is irrelevant that there was a well [the McCoy well] originally drilled nearby whose bottom hole [in 1962] did underlie the Lease. In fact, the reentry upon which Mr. White lays his foundation for extension of the primary term of the lease did not penetrate and remove the plugs which had long since sealed off that original bottom hole.

■■■ White argues that DNR's failure to grant him a hearing violated his right to due process guaranteed by the Alaska Constitution. We agree.

■■■ To prevail in an action for the violation of due process rights, a plaintiff must prove two things: "state action" and "the deprivation of an individual interest of sufficient importance to warrant constitutional protection." [8] Both of these prerequisites are met in this case. The Commissioner's denial of the assignment of the Tucson Group's lease to White constitutes state action, and the rights to the lease of which White was the assignee are "of sufficient importance to warrant constitutional protection" in this case.

Nevertheless, we have held that although a hearing

> is normally one of the basic components of due process, it is subject, at least in the area of administrative law, to the exception that one need not hold a hearing if there is nothing to hold a hearing about; or, more precisely, "there is no requirement, constitutional or otherwise, that there be a hearing in the absence of substantial and material issues crucial to (the) determination." [9]

Citing 11 AAC 02.050(a), which provides that "[DNR] will, in its discretion, hold a hearing when questions of fact must be resolved," the State argues that the Commissioner "did not abuse his discretion by not holding a hearing since there were no outstanding issues of material fact" in the case. We disagree. With regard to the automatic extension provision of paragraph 4(c)(1) of the lease there was an important factual dispute—the depth to which White had reentered the McCoy well and whether this was deep enough to put the bottom hole of the well under the leased property. The Commissioner, apparently relying upon an internal memorandum to the DNR Director who made the initial ruling in White's case, concluded that the McCoy well's bottom hole did not underlie the lease. The internal DNR memorandum stated:

> We pulled a mineral estate status plat in an effort to determine if the bottom hole

---

7. A "bottom hole" is "the lowest or deepest part of a well." Petroleum Extension Service, *A Dictionary of Petroleum Terms* 497 (Jodie Leecraft ed., 3d ed.1983).

8. *Estate of Miner v. Commercial Fisheries Entry Comm'n,* 635 P.2d 827, 829 (Alaska 1981) (citations omitted).

9. *Id.* at 834 (quoting *NLRB v. Bata Shoe Co.,* 377 F.2d 821, 826 (4th Cir.1967)).

location [of the McCoy well] reached in 1985 went anywhere near ADL 359242. It did not. The surface location we plotted was 143.7 feet from the S line and 1429 feet from the E line of T. 1S, R. 13W, S.M. White's bottom hole location in 1985 remained on the [McCoy] fee lease very near the surface location because of the relatively shallow 3500 foot depth that he redrilled—it is only about 175 feet west from the surface location. It appears that the interval that White tested on the fee lease was about 500 feet from the edge of ADL 359242. White claims that the bottom hole location is much closer to the state lease— in the range of 50 feet. We have not tried to survey or measure the exact bottom hole location relative to the state lease. At best it could be very close to the lease line but not over it.

At 3,500 feet, White would not have drilled through the first plug in the well which was at 3,718 feet. White argues, however, that he reentered the McCoy well to 3,840 feet, beyond the first plug in the well. He therefore claims that the "well bore was, at that point opened to the second cement plug at a depth of 7,400" feet, which extended under the lease. Thus, according to White, an "open well bore thereafter ran from [the McCoy well] out into the State offshore lease," resulting in the bottom hole of the McCoy well being "in" the State's leased property.

■■■ These differing accounts of the extent to which White reentered the McCoy well represent a factual dispute that is material to the issue of whether the automatic extension provision of paragraph 4(c)(1) applies to this case. As such, this issue warranted a hearing.[10] The State argues, however, that White raises the theory of breaching the first plug in the well for the first time on appeal, and therefore we should decline to consider it. We do not read White's previous arguments before the Commissioner so narrowly. In his filings before the Commissioner, White stated that he would "present testimony that a 3,500

foot hole drilled in the [McCoy] well could just as well be 43 feet under the State lease as 43 feet short of it." Thus, it is true that White, on one hand, seems to be arguing that he drilled only to 3,500 feet. But he also argued that "the 'bottom hole' of the re-entered well was not where drilling stopped at 3,500 feet but rather at the *next* Union plug hundreds of feet further down." This argument before the Commissioner is consistent with White's contention on this appeal—mainly, that his drilling breached the first plug and therefore he should be deemed to have reached the depth of the second plug.

The Commissioner's alternative ground for affirming the Director's decision does not alter our conclusion that White was entitled to a hearing in this case. The Commissioner appears to have concluded that even if White had reentered the McCoy well to a depth below the State lease, the reentry would have been unauthorized:

> In addition, the permits granted to perform the reentry work prohibited work in the deeper portions of the well bore. Further, in spite of the failure of the operator who performed the first re-entry in 1985 to complete the paperwork necessary to close out the work, any new re-entry to accomplish that breech [sic] of the plugs sealing the lower extremities of the well would be a new re-entry, and not an extension of the first.

On appeal, the State similarly argues that "even if White had removed the first well plug, he had no authority to enter the Lease."

We do not question the legal premise underlying this conclusion.[11] However, the record indicates that there is a factual dispute as to whether White was granted the authority to drill under the State lease.

One could read White's drilling permit, which authorizes him to "re-enter [the] well to 3,850 feet," as a limitation on the depth of his drilling activities. However, this depth is beyond the first plug, so by allowing White to

---

**10.** Obviously, when regulation 11 AAC 02.050(a), which grants DNR the discretion to hold a hearing, conflicts with the requirements of the state due process clauses, the former must give way to the latter.

**11.** *See, e.g.,* 20 AAC 25.005(i) ("A drilling permit is not valid at a location where the applicant does not have a right to drill for, produce, and remove oil and gas.").

drill to 3,850 feet, White may have been effectively granted permission to open the well to the second plug, which is at 7,400 feet. Moreover, the Commissioner's factual conclusion that White's permits "prohibited work in the deeper portions of the well bore" is not supported by the record. None of the permits granted to White contains such an express prohibition. Indeed, DNR itself, in its internal memorandum to the Director, stated, "[t]here is no reason why White could not deepen the well he has re-entered—but he hasn't tried to do this to date." Thus, assuming that White actually reentered the McCoy well to such a depth that its bottom hole was under the State lease, there is a factual dispute about whether White was actually authorized to do so.

## IV. CONCLUSION

White is entitled to a hearing on the issue of whether he meets the requirements of the automatic extension provision of paragraph 4(c)(1) of the lease. We REMAND to the Commissioner on this issue only.[12] In all other respects, we AFFIRM the decisions of the Commissioner and the superior court.

CARPENETI, Justice, not participating.

12. Although we agree with the State's argument that White's well completion report was filed too late for the Commissioner to have initially considered it, we see no reason why White may not utilize the report as evidence to support his case before the Commissioner on remand.