261 P.3d 412 (2011)
ALASKAN CRUDE CORPORATION and James W. White, Appellants,
v.
STATE of Alaska, DEPARTMENT OF NATURAL RESOURCES, DIVISION OF OIL AND GAS, Appellee.
No. S-13708.
Supreme Court of Alaska.
October 7, 2011.
*413 Brian J. Stibitz, Reeves Amodio LLC, Anchorage, and Heather L. Gardner, Shortell Gardner LLC, Anchorage, for Appellants.
Jeffrey D. Landry, Senior Assistant Attorney General, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Appellee.
Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

OPINION
FABE, Justice.

I. INTRODUCTION
Appellant Alaskan Crude Corporation operates an oil and gas unit near Deadhorse known as the Arctic Fortitude Unit. Appellant James W. White is the president of Alaskan Crude and a leaseholder of an oil *414 and gas lease that is part of the Arctic Fortitude Unit. Alaskan Crude's unit agreement with the Department of Natural Resources set work obligation deadlines that Alaskan Crude was required to meet to continue operating the Arctic Fortitude Unit. In July 2008 the Department of Natural Resources Commissioner found that Alaskan Crude had failed to meet its work obligations, gave notice that Alaskan Crude was in default under its unit agreement, and specified that the Arctic Fortitude Unit would be terminated if Alaskan Crude did not cure the default by a new set of deadlines.
Alaskan Crude appealed the Commissioner's decision to the superior court, arguing that a pending judicial decision in a separate appeal qualified as a force majeure under the unit agreement, preventing Alaskan Crude from meeting its work obligations. It also argued that the Commissioner's proposed default cure was an improper unilateral amendment of Alaskan Crude's unit agreement. The superior court affirmed the Commissioner's findings and decision and Alaskan Crude appealed. We conclude that (1) the pending judicial decision in Alaskan Crude's separate appeal did not trigger the force majeure clause of the unit agreement; and (2) the Commissioner's proposed default cure was not a unilateral amendment of Alaskan Crude's unit agreement. We thus affirm the decision of the superior court upholding the decision of the Commissioner.

II. FACTS AND PROCEEDINGS
In June 2006 the Department of Natural Resources (DNR), Oil and Gas Division approved the formation of the Arctic Fortitude Unit (the Unit), an oil and gas unit made up of three individual leases located near Deadhorse.[1] Alaskan Crude Corporation is the operator of the Unit, and James W. White is one of the leaseholders as well as the president of Alaskan Crude.[2] One of the leases included in the Unit contains a pre-existing well known as Burglin 33-1.
Since the formation of the Unit, Alaskan Crude has been involved in two separate but closely related disputes with several state agencies. The first dispute, with the Department of Environmental Conservation (DEC) and the Alaska Oil and Gas Conservation Commission (AOGCC), concerns whether an oil spill contingency plan is required for the Burglin 33-1 well. That dispute is the subject of a separate appeal before this court. The second dispute, which involves the DNR Oil and Gas Division (the Division) and is the subject of this appeal, concerns Alaskan Crude's work obligations under its unit agreement and whether the pending appeal in the first dispute created a force majeure preventing Alaskan Crude from meeting those obligations. A discussion of both disputes is necessary to understand the issues underlying this appeal.

A. The Dispute Concerning Alaskan Crude's Oil Spill Contingency Plan.
The operator of an oil exploration facility must develop a contingency plan in case of an oil spill and obtain approval of that plan from DEC in consultation with AOGCC.[3] The contingency plan requirements are based primarily on the number of barrels of oil per day that the exploration facility should be prepared to contain in the event of a spill; that number is known as the response planning standard.[4] Gas-only wells, however, are exempt from these requirements.[5]
When the Unit was formed, Alaskan Crude seemed to suggest that it intended to use the *415 Burglin 33-1 well to explore for both oil and gas. Almost one year after the Unit's formation, Alaskan Crude requested an 85% reduction in the response planning standard for the Burglin 33-1 well, neither requesting a declaration that the well was a "natural gas exploration facility" nor mentioning the rules exempting gas-only wells. DEC approved the reduction on AOGCC's recommendation but also noted AOGCC's determination that it would be inappropriate to classify the well as a gas-only well. Alaskan Crude requested reconsideration, citing the statutory exemptions for gas-only wells and arguing that the 85% reduction was insufficient.
After a hearing (which the parties did not attend), AOGCC reaffirmed its earlier determination that Burglin 33-1 was not a gas-only well and further reduced the response planning standard based upon new computer modeling of the well's potential flow rate. Alaskan Crude then indicated that it was now planning to test the well at a shallower depth than it had previously intendeda depth which would not be "capable of unassisted flow to the surface"and requested that AOGCC reconsider its decision on this basis.
AOGCC treated Alaskan Crude's request as a new application for a recommended response planning standard based upon the shallower depth and further reduced the response planning standard to 115 barrels of oil per day. Alaskan Crude did not seek agency rehearing of this determination; instead, it appealed to the superior court pursuant to AS 22.10.020(d), arguing that the well is gas-only and is exempt from oil spill contingency planning.[6] The superior court upheld AOGCC's determination on December 8, 2010.[7] That decision is the subject of a separate appeal to this court.

B. The Dispute Concerning Alaskan Crude's Work Obligation Deadlines And The Force Majeure Clause.
While Alaskan Crude was disputing whether it was exempt from an oil spill contingency plan, it was also having difficulty meeting the work obligations outlined in its plan of exploration. DNR regulations provide that to form an oil and gas unit, lessees must propose a unit agreement and a plan of exploration.[8] Failure to comply with the terms of the approved unit agreement or the plan of exploration is a default under the unit agreement.[9] When a default occurs the DNR Commissioner must provide notice to the unit operator and a demand to cure the default by a specific date.[10] If the default is not cured by the specified date the Commissioner has discretion to terminate the unit agreement.[11]
Under Article 20 of Alaskan Crude's unit agreement, failure to comply with the terms of the unit agreement or the plan of exploration because of "force majeure" is not a default. Force majeure is defined by DNR regulations as "war, riots, acts of God, unusually severe weather, or any other cause beyond the unit operator's reasonable ability to foresee or control and includes operational failure to existing transportation facilities and delays caused by judicial decisions or lack of them."[12] White's oil and gas lease also provided that "[i]f the state determines that the lessee has been prevented by force majeure, after efforts made in good faith, from performing any act that would extend the lease beyond the primary term, this lease will not expire during the period of force majeure." The language defining force majeure in the lease is identical to the DNR regulations.
The initial plan of exploration for the Unit contained several work obligation deadlines. *416 The deadlines at issue in this appeal are the "Stage 2 work obligations"; specifically, that Alaskan Crude move a drilling rig onto the Burglin 33-1 well pad and re-drill the well.[13] The initial plan of exploration required Alaskan Crude to complete the Stage 2 work obligations by October 1, 2007. The plan of exploration also provided that if Alaskan Crude missed its work obligation deadlines the Unit would automatically terminate.
On June 26, 2007, a year after the initial plan of exploration was approved, Alaskan Crude sent a letter to the Division requesting a modification of the Stage 2 work obligations. The letter alleged that although Alaskan Crude had "diligently pursued permits and required authorizations," "winter tundra travel equipment shortages and summer tundra travel restrictions" made it impossible to meet the work obligations by October 1, 2007. Alaskan Crude requested that the deadline for these obligations be changed to October 1, 2008.
The Division denied this request on June 28, 2007. The Division explained that Alaskan Crude's summer tundra travel plans had been delayed because Alaskan Crude had not submitted the proper permit application or requested a permitted contractor and that Alaskan Crude had been given sufficient time to schedule winter equipment deliveries. The Division reminded Alaskan Crude that the Unit would automatically terminate if the work obligations were not met and notified Alaskan Crude of its right to appeal the decision to the DNR Commissioner. Alaskan Crude appealed the denial of its modification request on July 17, 2007 and requested a hearing. The hearing was held on September 28, 2007, but Alaskan Crude did not attend.
On November 6, 2007, Alaskan Crude and the Division settled the appeal by agreeing to an amended plan of exploration. The amended plan of exploration changed the deadlines for the Stage 2 work obligations, requiring Alaskan Crude to deliver the necessary drilling equipment to the Burglin 33-1 well pad by May 15, 2008 and to re-drill the well by October 1, 2008.
In January 2008 Alaskan Crude sent an email to the Division stating that Alaskan Crude was unable to communicate with AOGCC regarding the development of a contingency plan and that this inability was "delaying [its] ability to obtain a [contingency plan] and forcing work into a force majeure situation." The email asked for the Division's advice. The Division responded on January 16 that Alaskan Crude's claim was "incorrect," that Alaskan Crude was "in control of the process," and that the Division saw no cause for delays in the work obligations.[14] On February 2, Alaskan Crude sent a letter notifying the Director of the Division that it was "appealing" the decision made in the January 16 email to deny Alaskan Crude's request "to have the Arctic Fortitude Unit contract and associated plan of exploration obligations be placed in force majeure status due to the unforeseen delay in the ability of [Alaskan Crude] to permit the re-entry of the Burglin 33-1 well." Alaskan Crude repeated its assertion that AOGCC was refusing to communicate with Alaskan Crude about its contingency plan.
The Division Director responded on February 15, 2008. The Division Director informed Alaskan Crude that it could not process the letter as an "appeal" because the January 16 email was simply informal advice and not a decision capable of appeal under DNR regulations.[15] But the Division Director also said that he would consider the letter an original request to toll Alaskan *417 Crude's work obligations so long as Alaskan Crude provided further information within seven days about "the specific nature of the alleged force majeure and whether it is ongoing" and "which work commitments [Alaskan Crude] want[s] tolled and for how long."
Eleven days later, on February 26, Alaskan Crude sent a fax to the Division Director purporting to provide the requested information. The fax stated that Alaskan Crude "asks again for a declaration of force majeure for an extension of the ... work commitment deadlines commensurate with the period of the force majeure caused by AOGCC actions." It alleged that "[t]he period of force majeure has been 90 days so far and is still continuing.... The AOGCC is holding [Alaskan Crude] hostage in this matter because of [a] pending appeal [Alaskan Crude] has with the AOGCC on [an] entirely separate and unrelated matter."
On March 24 the Division denied Alaskan Crude's request to invoke the force majeure clause and toll its work obligations. The Division Director stated that there was "no evidence" that AOGCC had delayed Alaskan Crude's ability to prepare and submit a contingency plan and that "AOGCC did not refuse to discuss matters involving the well with [Alaskan Crude] or its consultant." The Division Director found that Alaskan Crude "is requesting to delay its ... work commitments solely because it is dissatisfied with the AOGCC's determination that the Burglin 33-1 well is not a gas-only well" and that AOGCC's determination and Alaskan Crude's subsequent appeal were "not force majeure events" because they were not beyond Alaskan Crude's "reasonable ability to foresee or control."[16] The Division Director observed that AOGCC had granted Alaskan Crude's original request for a reduction in the response planning standard and that "the appeal of the gas-only determination is entirely within [Alaskan Crude's] control; you can't create your own force majeure through litigation." Finally, the Division Director also found that "the dispute and litigation with the AOGCC" was not preventing Alaskan Crude from meeting its work obligations because Alaskan Crude was not required to have an approved contingency plan to move a drilling rig to the well pad.
On April 10, 2008, Alaskan Crude appealed the Division's decision to the DNR Commissioner. Alaskan Crude asserted that "from the beginning" it had intended to explore Burglin 33-1 as a gas-only well, that AOGCC's determination was thus "clearly unanticipated" and "out of [Alaskan Crude's] ability to control," and that Alaskan Crude had been "forced" to file a superior court action "to obtain the necessary determination." The appeal concluded that the pending judicial action regarding the gas-only exemption was a force majeure because it "will directly affect [Alaskan Crude's] proposed actions" and "it is not prudent to execute the work obligations ... until this issue is decided."
While the appeal to the DNR Commissioner was pending, DNR reminded Alaskan Crude that its work obligations remained in place. Alaskan Crude then made two additional requests to the Director of the Division, on April 24 and May 5, to amend the plan of exploration and push back the work obligation deadlines. Alaskan Crude suggested new deadlines of March 31, 2009, for moving a drilling rig to the Burglin 33-1 well, and October 1, 2009, for re-drilling the well. These requests were not acted upon, and on May 15, 2008, Alaskan Crude defaulted on its work obligation to deliver a drilling rig to the Burglin 33-1 well.
On July 16, 2008, the DNR Commissioner issued findings and a decision regarding the force majeure appeal. The Commissioner made several factual findings, including that Alaskan Crude had agreed to the amended plan of exploration and the May 15 deadline after AOGCC had determined that Burglin 33-1 was not a gas-only well.[17] The Commissioner *418 also decided that there was "no basis to determine a force majeure exists" under either the Unit's oil and gas leases or the unit agreement. The Commissioner cited the same reasons provided by the Division Director: that Alaskan Crude's litigation with AOGCC was not beyond its ability to foresee or control because Alaskan Crude agreed to the amended deadlines after receiving AOGCC's initial determination; and that the litigation did not prevent Alaskan Crude from meeting its work obligations because contingency plan approval was not required to move a drilling rig to the well platform.
The Commissioner also gave notice that Alaskan Crude was in default under its unit agreement because it had failed to move a drilling rig to the well by May 15, 2008.[18] The Commissioner set out a default cure demand that required Alaskan Crude to move a drilling rig to the well by March 31, 2009 and re-drill the well by October 1, 2009;[19] this default cure had "the practical effect of granting [Alaskan Crude's] requests to delay its work obligations" under the amended plan of exploration.
Alaskan Crude appealed the Commissioner's findings and decision to the superior court, arguing that the Commissioner erred in determining that there was no basis to invoke the force majeure clause and that the Commissioner's proposed default cure was an impermissible unilateral amendment of the plan of exploration. The superior court affirmed the Commissioner's decision that Alaskan Crude could not invoke the force majeure clause but used slightly different reasoning. The Division, and the DNR Commissioner, analyzed Alaskan Crude's "dispute and litigation with the AOGCC" as a single event and concluded that it was not a force majeure because it was within Alaskan Crude's ability to foresee or control and did not prevent Alaskan Crude from fulfilling its work obligations. The superior court analyzed AOGCC's determination and the lack of a decision on the appeal from that determination as separate events. First, the superior court concluded that the AOGCC determination itself was not a "judicial decision" covered by the force majeure clause because AOGCC "is a quasi-judicial, as opposed to judicial, body." Second, the superior court concluded that although the lack of a judicial decision on appeal from the AOGCC determination could fall within the clause, it had not prevented Alaskan Crude from fulfilling its work obligationsit only made those obligations more expensive than Alaskan Crude had hoped. The superior court did not specifically address whether the lack of a judicial decision was within Alaskan Crude's ability to foresee or control, but it did comment that when Alaskan Crude entered the amended unit agreement, it knew that "the lack of exemption [as a gas-only well] was a certainty, at least pending the outcome of a lengthy appeal."
The superior court also held that the DNR Commissioner's proposed default cure did not unilaterally amend Alaskan Crude's unit agreement because the unit agreement "itself sets out the procedure for issuing demands to cure."[20] The superior court therefore affirmed the DNR Commissioner's findings and decision on October 27, 2009.[21] Alaskan Crude appeals.

III. STANDARD OF REVIEW
"When the superior court acts as an intermediate appellate court in an administrative matter, we independently review the *419 merits of the administrative decision."[22] We have "recognized four principal standards of review for administrative decisions: (1) the substantial evidence standard applies to questions of fact; (2) the reasonable basis standard applies to questions of law involving agency expertise; (3) the substitution of judgment standard applies to questions of law where no expertise is involved; and (4) the reasonable and not arbitrary standard applies to review of administrative regulations."[23] We apply the reasonable basis standard "[w]hen reviewing an agency's interpretation of its own regulation."[24] Under this standard, we "defer to the agency unless its interpretation is plainly erroneous and inconsistent with the regulation."[25] "Questions of contract interpretation generally raise questions of law that we review de novo."[26]
The parties dispute the proper standard of review because they dispute which force majeure clausethe clause contained in White's oil and gas lease or the clause contained in the unit agreementapplies to Alaskan Crude's work obligations. Alaskan Crude argues that the applicable clause is contained in the oil and gas lease and thus should be reviewed de novo as a matter of contract interpretation. DNR responds that the applicable clause is contained in the unit agreement, with the definition of force majeure provided by DNR regulations, and thus DNR's decision that a force majeure did not exist in this case was an interpretation of its own regulations that should be given deference.
We conclude that DNR is correct. When Alaskan Crude missed the May 15, 2008 deadline for its work obligations, it defaulted on the unit agreement. But the default itself had no consequences for the individual oil and gas leases. By entering the unit agreement, the original terms of the individual leases were automatically extended for the duration of the unit's existence. Therefore, only termination of the unitnot defaultcould lead to expiration of White's lease term and create the need to save the lease from expiration by invoking the lease's force majeure clause.[27] Thus, the failure to meet work obligations under the unit agreement due to a force majeure is governed by Article 20 of Alaskan Crude's unit agreement, which simply states that the "failure to comply [with the unit agreement] because of force majeure is not a default." The definition of force majeure for purposes of the unit agreement is contained in DNR regulations.[28] The DNR Commissioner's decision that a force majeure did not exist was thus an interpretation of the agency's own regulations and the deferential reasonable basis standard applies.

IV. DISCUSSION
Alaskan Crude appeals the same aspects of the DNR Commissioner's decision that it challenged in the superior court. First, Alaskan Crude argues that the AOGCC's determination that Burglin 33-1 was not a gas-only well, and the pending appeal of that determination, were force majeure events that prevented Alaskan Crude from meeting its work obligations. Second, Alaskan Crude argues that the Commissioner's proposed default cure was a unilateral amendment of its unit agreement.

*420 A. Alaskan Crude's Pending Appeal Of The AOGCC Decision Was Not A Force Majeure.
The definition of force majeure that applies to Alaskan Crude's unit agreement requires the alleged force majeure to be "beyond the unit operator's reasonable ability to foresee or control."[29] The DNR Commissioner concluded that Alaskan Crude's dispute with AOGCC was not a force majeure because Alaskan Crude had agreed to the May 15, 2008 deadline after it received AOGCC's final determination that Burglin 33-1 was not a gas-only well. We agree with this conclusion and hold that AOGCC's decision and Alaskan Crude's appeal of that decision were not force majeure events because they were not beyond Alaskan Crude's reasonable ability to foresee or control.
The requirement that a force majeure event be unforeseeable is a common characteristic of force majeure clauses in oil and gas leases. "Force majeure clauses extend [mineral] leases only when the nonperformance is `caused by circumstances beyond the reasonable control of the lessee or by an event which is unforeseeable at the time the parties entered into the contract.'"[30] This rule remains applicable when the alleged force majeure is a decision made by a governmental body: "A government order predating the lease execution has never been held to be a force majeure event."[31] And in this case, the government action that Alaskan Crude claims created a force majeureAOGCC's decision that Burglin 33-1 was not a gas-only wellpredated the amended plan of exploration that set the deadlines at issue in this case.
Alaskan Crude received Other Order No. 51, AOGCC's final decision that Burglin 33-1 was not a gas-only well, on October 1, 2007. Alaskan Crude requested reconsideration of the order on October 11, and AOGCC denied reconsideration on October 24. On November 6, 2007, Alaskan Crude then agreed to an amended plan of exploration that included the deadlines of May 15, 2008, for moving drilling equipment to the well pad, and October 1, 2008, for re-drilling the well. After agreeing to those deadlines, Alaskan Crude filed an appeal of AOGCC's decision in superior court on November 19, 2007, without seeking expedited review.
AOGCC's decision was thus incapable of being an unforeseeable force majeure because Alaskan Crude already knew of the decision when it agreed to the amended deadlines.[32] It was also reasonably foreseeable at the time Alaskan Crude agreed to the amended deadlines that if Alaskan Crude chose to appeal AOGCC's decision, that appeal would not be resolved before the deadlines arrived. Alaskan Crude filed its notice of appeal to the superior court less than six months before the May 15, 2008 deadline and did not seek expedited review.[33] The DNR Commissioner's decision that a force majeure did not exist was therefore not plainly erroneous or inconsistent with the regulation defining force majeure, and we *421 affirm the superior court's decision upholding the Commissioner's decision.
Moreover, policy considerations support the conclusion that the AOGCC decision and Alaskan Crude's appeal of that decision did not create a force majeure. Unit agreements and plans of exploration for oil and gas development will often result in disagreements between unit operators and regulatory agencies.[34] If a unit operator could toll its work obligations simply by appealing any unfavorable decision from the State, however minor or foreseeable, and claiming that the appeal was a force majeure, development could be stalled indefinitely over routine disagreements. This does not diminish the right to appeal an unfavorable decision; if a unit operator wishes to appeal, it can always request that the superior court stay any intervening deadlines during the pendency of the appeal.[35]
Indeed, if Alaskan Crude believed that it could not complete its work obligations until the appeal of the AOGCC decision was resolved, it had several other options available rather than invoking the force majeure clause. The most obvious course of action would have been for Alaskan Crude, after learning of the AOGCC decision, to attempt to negotiate different deadlines for the amended plan of exploration that would accommodate the appeal. But even after agreeing to the new deadlines, Alaskan Crude could have requested that DNR amend the plan of exploration once again after the notice of appeal had been filed.[36] Finally, it could have requested a stay from the superior court until the appeal was decided.[37] Although there is no guarantee that these requests would have been granted, they would have been subject to the regular administrative review and appeal process and could have addressed Alaskan Crude's concerns without relying on the force majeure clause.[38]
Because we affirm the superior court's decision upholding the DNR Commissioner's decision on the ground that the delay in resolving the appeal was foreseeable, we need not address whether the unresolved appeal actually prevented Alaskan Crude from meeting its work obligations.

B. The DNR Commissioner's Proposed Default Cure Did Not Unilaterally Amend Alaskan Crude's Unit Agreement.
Alaskan Crude also appeals the default cure proposed by the DNR Commissioner, arguing that it constitutes an improper unilateral amendment of the unit agreement. The superior court rejected this argument, observing that "the Unit Agreement itself sets out the procedure for issuing demands to cure and minimum cure periods" and that the DNR Commissioner had complied with those procedures.
We agree with the superior court and conclude that the proposed default cure was in accordance with the terms of the unit agreement and was not an improper unilateral amendment. Article 20.02 of the unit agreement specifies that in the event of a default:
The Commissioner will give notice to the Unit Operator and the Working Interest Owners of the default. The notice will describe the default, and include a demand to cure the default by a certain date. The cure period shall be at least thirty days for *422 a failure to pay rentals or royalties and ninety days for any other default.[[39]]
The DNR Commissioner found that Alaskan Crude was in default and provided notice of that default on July 16, 2008. The Commissioner included a demand to cure the default by moving a drilling rig to the well by March 31, 2009 and re-drilling the well by October 1, 2009. This cure period was significantly longer than the 90-day minimum required by the unit agreement; in fact, the dates demanded by the DNR Commissioner were the same dates proposed by Alaskan Crude in its additional requests to amend the plan of exploration on April 24 and May 5, 2008. We conclude that the default cure was in accordance with the unit agreement and had the practical effect of granting Alaskan Crude's own request. It was not a unilateral amendment of the agreement and the decision of the superior court is affirmed.

V. CONCLUSION
For the foregoing reasons, we AFFIRM the decision of the superior court upholding the decision of the DNR Commissioner.
NOTES
[1] See generally Gottstein v. State, Dep't of Natural Res., 223 P.3d 609, 611 n. 4 (Alaska 2010) (noting regulations defining "unit" and "unit agreement").
[2] We refer to the appellants collectively as "Alaskan Crude."
[3] AS 46.04.030(b). AOGCC is an "independent quasi-judicial agency of the state" created by the Alaska Oil and Gas Conservation Act. AS 31.05.005(a). AOGCC, which has authority over all land subject to the state's police power, regulates to prevent waste, insure greater recovery, protect correlative rights and underground water, and further public health and safety. See AS 31.05.027; AS 31.05.095; AS 31.05.100; AS 31.05.110; AS 31.05.030.
[4] 18 Alaska Administrative Code (AAC) 75.434 (2004).
[5] AS 46.04.050(c).
[6] Alaskan Crude Corp. v. State, Alaska Oil & Gas Conservation Comm'n, No. 3AN-07-11471 CI (Alaska Super., Dec. 8, 2010).
[7] Id.
[8] 11 AAC 83.306 (requiring a proposed unit agreement as part of an application for DNR approval of an oil and gas unit); 11 AAC 83.341 (requiring a unit plan of exploration to be filed as an exhibit to the proposed unit agreement).
[9] 11 AAC 83.374(a).
[10] 11 AAC 83.374(b).
[11] 11 AAC 83.374(c)-(d).
[12] 11 AAC 83.395(3).
[13] At the time the Unit was formed, the Burglin 33-1 well was "suspended," meaning plugged with the option to later re-enter and re-drill the well. See 20 AAC 25.990(70) (defining suspended well); 20 AAC 25.110 (outlining the procedures for suspending a well).
[14] Due to the appeal to the superior court regarding the response planning standard, see supra Part II.A, AOGCC had determined that counsel needed to be present during any discussions with Alaskan Crude or its consultants. The Division of Oil and Gas described this not as a refusal of AOGCC to communicate with Alaskan Crude, but instead as "reasonable procedural guidelines under which those discussions could take place."
[15] See 11 AAC 02.900(4) (defining "decision" as "a written discretionary or factual determination by the department specifying the details of the action to be allowed or taken").
[16] See 11 AAC 83.395(3) ("`[F]orce majeure' means war, riots, acts of God, unusually severe weather, or any other cause beyond the unit operator's reasonable ability to foresee or control and includes operational failure to existing transportation facilities and delays caused by judicial decisions or lack of them.").
[17] Alaskan Crude does not appear to have challenged the Commissioner's factual findings in either the superior court or this appeal.
[18] See 11 AAC 83.374(a) ("Failure to comply with any of the terms of an approved unit agreement, including any plans of exploration ... is a default under the unit agreement."); 11 AAC 83.374(b) ("The commissioner will give notice to the unit operator and defaulting party ... of the default.").
[19] See 11 AAC 83.374(b) ("The notice will state the nature of the default and include a demand to cure the default by a specific date, which ... will be a date not less than 90 days after the date of the commissioner's notice of default.").
[20] Article 20 of Alaskan Crude's unit agreement sets out the same procedures for default, notice of default, and cure of the default that are contained in DNR regulations. See 11 AAC 83.374.
[21] The superior court also held that DNR had not interfered with Alaskan Crude's performance under its lease and unit agreement. Alaskan Crude does not appeal this part of the decision.
[22] Button v. Haines Borough, 208 P.3d 194, 200 (Alaska 2009) (citing Lakloey, Inc. v. Univ. of Alaska, 157 P.3d 1041, 1045 (Alaska 2007); Gunter v. Kathy-O-Estates, 87 P.3d 65, 68 (Alaska 2004)).
[23] Pasternak v. State, Commercial Fisheries Entry Comm'n, 166 P.3d 904, 907 (Alaska 2007) (citing Handley v. State, Dep't of Revenue, 838 P.2d 1231, 1233 (Alaska 1992)).
[24] Id. (citing Simpson v. State, Commercial Fisheries Entry Comm'n, 101 P.3d 605, 607 (Alaska 2004)).
[25] Id. (internal citations and quotation marks omitted).
[26] Beal v. McGuire, 216 P.3d 1154, 1162 (Alaska 2009) (citing Norville v. Carr-Gottstein Foods Co., 84 P.3d 996, 1000 n. 1 (Alaska 2004)).
[27] Default will not lead to termination if the unit operator cures the default by the date demanded by DNR. See 11 AAC 83.374(b). Even if the default is not cured, DNR must provide notice and an opportunity to be heard before terminating the unit. See 11 AAC 83.374(c).
[28] 11 AAC 83.395(3).
[29] Id.
[30] Goldstein v. Lindner, 673, 648 N.W.2d 892, 899 (Wis.App.2002) (quoting Atkinson Gas Co. v. Albrecht, 878 S.W.2d 236, 241 (Tex.App.1994)); see also Joan Teshima, Annotation, Gas and Oil Lease Force Majeure Provisions: Construction and Effect, 46 A.L.R.4th 976 § 2(a) (1986) ("A force majeure clause ... does not excuse a lessee's nonperformance where the condition alleged to constitute force majeure either was within the lessee's actual or presumed knowledge or was reasonably expectable by the lessee.").
[31] Teshima, supra note 30; see also Erickson v. Dart Oil & Gas Corp., 189 Mich.App. 679, 474 N.W.2d 150, 155 (1991) (citing Hughes v. Cantwell, 540 S.W.2d 742, 745 (Tex.Civ.App.1976)) ("Where governmental action is alleged to be the cause of delay, the parties to the lease are presumed to have contracted with knowledge of any preexisting law that could have caused delay.").
[32] The superior court held that AOGCC's decision could not trigger the force majeure clause because it was not a "judicial decision" but rather the decision of a quasi-judicial administrative body. We need not decide today whether the decision of a quasi-judicial body can be a force majeure as defined in DNR regulations. We simply conclude that even if such a decision could be a force majeure as a general matter, it is not one in the present case.
[33] Ultimately, Alaskan Crude's opening brief in that appeal was not filed until January 15, 2009eight months after the May 15, 2008 deadline had lapsed.
[34] See, e.g., Exxon Corp. v. State, 40 P.3d 786 (Alaska 2001) (appealing the denial of a request to DNR to expand the area covered by a unit agreement); Conoco, Inc. v. State, Dep't of Natural Res., Mem Op. & J. No. 668, 1993 WL 13563632 (Alaska, June 9, 1993) (appealing the denial of a request to DNR to reduce the royalty rate contained in a unit agreement); Gottstein v. State, Dep't of Natural Res., 223 P.3d 609 (Alaska 2010) (third-party appeal of DNR's approval of a plan for development); White v. State, Dep't of Natural Res., 984 P.2d 1122 (Alaska 1999) (appealing the denial of a request to DNR to assign a state land lease).
[35] AS 44.62.570(f).
[36] Alaskan Crude did eventually make two such requests, but not until April 24 and May 5, 2008, while the DNR Commissioner's decision regarding the force majeure clause was pending.
[37] AS 44.62.570(f).
[38] See, e.g., Exxon Corp., 40 P.3d 786; Conoco, Inc., Mem. Op. & J. No. 668, 1993 WL 13563632.
[39] Similar default and cure provisions are also contained in DNR's regulations. 11 AAC 83.374(b).